# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2012AP2067 |
| COMPLETE TITLE: | Madison Teachers, Inc., Peggy Coyne, Public Employees Local 61, AFL-CIO and John Weigman, Plaintiffs-Respondents, v. Scott Walker, James R. Scott, Judith Neumann and Rodney G. Pasch, Defendants-Appellants. |

ON CERTIFICATION FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | July 31, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 11, 2013 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Dane |
| JUDGE: | Juan B. Colas |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | CROOKS, J., concurs. (Opinion filed.) |
| DISSENTED: | BRADLEY, J., ABRAHAMSON, C.J., dissent. (Opinion filed.) |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendants-appellants, there were briefs by *J.B. Van Hollen*, attorney general, and *Kevin St. John*, deputy attorney general, *Steven P. Means*, executive assistant attorney general, and *Steven C. Kilpatrick*, assistant attorney general. Oral argument by *J.B. Van Hollen* and *Kevin St. John*.

For the plaintiff-respondents, there was a brief by *Lester A. Pines*, *Lee Cullen*, *Tamara B. Packard*, *Susan M. Crawford*, and *Cullen Weston Pines & Bach LLP*, Madison; and *M. Nicol Padway*, *Aaron A. DeKosky*, and *Padway & Padway, Ltd.*, Milwaukee; and oral

argument by *Lester A. Pines*, *Tamara B. Packard*, and M. *Nicol Padway*.

An amicus curiae brief was filed by *Michael P. May*, city attorney, and *John W. Strange*, assistant city attorney, on behalf of the City of Madison.

An amicus curiae brief was filed by *Bruce F. Ehlke*, *Katy Lounsbury*, and *Ehlke, Bero-Lehmann & Lounsbury, S.C.*, Madison, on behalf of Laborers Local 236 and AFSCME Local 60.

An amicus curiae brief was filed by *Grant F. Langley*, city attorney, *Rudolph M. Konrad*, deputy city attorney, *Stuart S. Mukamal*, assistant city attorney, and *Donald L. Schriefer*, assistant city attorney, on behalf of the City of Milwaukee.

An amicus curiae brief was filed by *Milton L. Chappell*, *Nathan J. McGrath*, and *National Right to Work Legal Defense Foundation*, Inc., Springfield, VA; and *Richard M. Esenberg*, *Thomas C. Kamenick*, *Brian McGrath*, and Wisconsin Institute for Law & Liberty, Milwaukee; and *Bruce N. Cameron*, Regent University School of Law, Virginia Beach, VA; on behalf of Elijah Grajkowski, Kristi Lacroix, and Nathan Berish.

An amicus curiae brief was filed by *Timothy E. Hawks* and *Hawks Quindel, S.C.*, Milwaukee; and *Marianne Goldstein Robbins* and *The Previant Law Firm S.C.*, Milwaukee; and *Stephen Pieroni*, Madison; and *Peggy A. Lautenschlager* and *Bauer & Bach, LLC*, Madison; and *Aaron N. Halstead* and *Hawks Quindel, S.C.*, Madison; and *Barbara Zack Quindel* and *Hawks Quindel*, Milwaukee; and *Jeffrey Sweetland* and *Hawks Quindel, S.C.*, Milwaukee; and *Mark A. Sweet* and *Sweet and Associates, LLC*, Milwaukee; on behalf of the Wisconsin Education Association Council, AFSCME District Councils 24, 40, and 48, AFT-Wisconsin, SEIU Healthcare

Wisconsin, Wisconsin Federation of Nurses and Health Professionals, and State of Wisconsin AFL-CIO.

An amicus curiae brief was filed by *Andrew T. Phillips*, *Daniel J. Borowski*, *Jacob J. Curtis*, and *Phillips Borowski S.C.*, Mequon, on behalf of Wisconsin County Mutual Insurance Corporation and Community Insurance Corporation.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2012AP2067
(L.C. No. 2011CV3774)

STATE OF WISCONSIN      :      IN SUPREME COURT

Madison Teachers, Inc., Peggy Coyne, Public
Employees Local 61, AFL-CIO and John Weigman,

      Plaintiffs-Respondents,

  v.

Scott Walker, James R. Scott, Judith Neumann
and Rodney G. Pasch,

      Defendants-Appellants.

**FILED**

**JUL 31, 2014**

Diane M. Fremgen
Clerk of Supreme Court

APPEAL from a judgment and order of the Circuit Court for Dane County, Juan B. Colas, Judge. *Reversed.*

¶1 MICHAEL J. GABLEMAN, J. In March 2011, the Wisconsin Legislature passed Act 10,[1] a budget repair bill proposed by Governor Scott Walker. Act 10 significantly altered Wisconsin's

---

[1] Provisions of Act 10 were reenacted without amendment in 2011 Wisconsin Act 32 ("Act 32"), the 2011-13 state budget, which reestablished collective bargaining rights for some municipal transit employees. For ease of discussion, we refer to the Municipal Employment Relations Act, as amended by Acts 10 and 32, as "Act 10."

public employee labor laws. Act 10 prohibits general employees from collectively bargaining on issues other than base wages, prohibits municipal employers from deducting labor organization dues from paychecks of general employees, imposes annual recertification requirements, and prohibits fair share agreements requiring non-represented general employees to make contributions to labor organizations.

¶2 In August 2011, Madison Teachers, Inc. and Public Employees Local 61 sued Governor Walker and the three commissioners of the Wisconsin Employment Relations Commission challenging several provisions of Act 10. The plaintiffs alleged, among other things, that four aspects of Act 10——the collective bargaining limitations, the prohibition on payroll deductions of labor organization dues, the prohibition of fair share agreements, and the annual recertification requirements—— violate the constitutional associational and equal protection rights of the employees they represent. The plaintiffs also challenged Wis. Stat. § 62.623 (2011-12),[2] a separate provision created by Act 10, which prohibits the City of Milwaukee from paying the employee share of contributions to the City of

---

[2] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise noted.

Milwaukee Employes'[3] Retirement System, alleging it violates the home rule amendment to the Wisconsin Constitution. The plaintiffs argued, in the alternative, that if Wis. Stat. § 62.623 does not violate the home rule amendment, it nevertheless violates the constitutionally protected right of parties to contract with each other.

¶3 The Dane County Circuit Court, Judge Juan B. Colas, presiding, invalidated several provisions of Act 10, including the provisions relating to collective bargaining limitations, union recertifications, and the prohibitions on fair share agreements and payroll deductions of labor organization dues. The court of appeals certified the case to this court, pursuant to Wis. Stat. § 809.61. We now uphold Act 10 in its entirety.

I.  BACKGROUND AND PROCEDURAL HISTORY

¶4 Plaintiff-Respondents are Madison Teachers, Inc. ("MTI"), Public Employees Local 61 ("Local 61"), and their

---

[3] "Employes" is an alternate spelling for "Employees." Webster's Third New International Dictionary 743 (3d ed. 2002). "Employe" was once the common spelling in English. Bryan A. Garner, A Dictionary of Modern Legal Usage, 312 (2d ed. 2001) (citing Hull v. Philadelphia & R.R., 252 U.S. 475, 479 (1920) ("We need hardly repeat the statement . . . that in the Employers' Liability Act Congress used the words 'employé' and 'employed' in their natural sense, and intended to describe the conventional relation of employer and employé.")). In fact, H.W. Fowler, an ardent advocate of the "-ee" suffix, notes in the first edition of A Dictionary of Modern English Language (1926) that in the late 19th century the Oxford English Dictionary "labelled employee 'rare exc. U.S.'"").

We will use the more contemporary spelling, "employee," unless the alternative spelling, "employe" appears in quoted language or in a party's name.

respective representatives, Peggy Coyne and John Weigman. MTI is a labor organization representing over 4,000 municipal employees of the Madison Metropolitan School District. Local 61 is a labor organization representing approximately 300 City of Milwaukee employees.[4]

¶5 The Defendant-Appellants are Governor Walker and the three commissioners of the Wisconsin Employment Relations Commission ("WERC"), James R. Scott, Judith Neumann, and Rodney G. Pasch (collectively, "the defendants"). Governor Walker and the commissioners of WERC are sued in their official capacities. Governor Walker has responsibility under Wisconsin law to implement and enforce state legislation through the agencies of the State's executive branch. The commissioners of WERC are responsible for administering Wisconsin's labor laws.

¶6 Wisconsin has two principal labor laws, the Municipal Employment Relations Act ("MERA"), Wis. Stat. § 111.70 et seq., and the State Employee Labor Relations Act ("SELRA"), Wis. Stat.

---

[4] Act 10 creates two primary categories of public employees: "general employees" and "public safety employees." MTI and Local 61 represent "general employees," as defined under Act 10. Under Act 10, "general employees" is a catch-all term for public employees who are not "public safety employees." See, e.g., Wis. Stat. § 111.70(fm). Employees classified as "public safety employees" are not affected by Act 10's modifications to the Municipal Employment Relations Act and the State Employee Labor Relations Act. The United States Court of Appeals for the Seventh Circuit recently held, under a rational basis standard of review, that the public employee classifications created by Act 10 did not violate equal protection. See Wis. Educ. Ass'n Council v. Walker, 705 F.3d 640, 656 (7th Cir. 2013). The public employee classifications are not at issue in this appeal.

4

§ 111.80 et seq., which govern employment relations and collective bargaining for public employees and labor organizations.

¶7 In 2011, the Wisconsin Legislature enacted 2011 Wisconsin Act 10, a budget repair bill proposed by Governor Walker. Act 10, among other things, modified MERA to prohibit general employees from collective bargaining on issues other than "base wages," prohibited fair share agreements, imposed annual recertification requirements, and prohibited municipal employers from deducting labor organization dues from the paychecks of general employees.[5]

¶8 MTI and Local 61 (together with the individual plaintiffs, "the plaintiffs") filed the instant action in Dane County Circuit Court in August 2011 seeking declaratory and injunctive relief, alleging that certain portions of Act 10 violated the Wisconsin Constitution.

¶9 In November 2011, the plaintiffs sought summary judgment on the following claims: (1) that Act 10 violates the plaintiffs' right to free association guaranteed by Article I, Sections 3 and 4 of the Wisconsin Constitution through the combined effect of (a) prohibiting general employees from

---

[5] The plaintiffs argue that specific provisions of MERA, as amended by Act 10, are unconstitutional. SELRA, which is the counterpart legislation affecting state employees, is not being challenged. However, as the court of appeals observed in its certification to this court, any decision on the provisions affecting municipal employees under MERA would appear to be dispositive with respect to state employees under SELRA as well.

collective bargaining on issues other than "base wages," and requiring any base wage increase exceeding a cost of living adjustment to be approved by a municipal voter referendum, (b) prohibiting municipal employers from deducting labor organization dues from the paychecks of general employees, (c) prohibiting fair share agreements,[6] and (d) requiring mandatory recertification elections; (2) that Act 10 violates the plaintiffs' right to equal protection of the laws guaranteed by Article I, Section 1 of the Wisconsin Constitution by impermissibly creating classifications that disadvantage represented general employees based on the exercise of their rights to associate; (3) that certain provisions of Act 10 were enacted in a manner that violated Article VI, Section 11 of the Wisconsin Constitution, which governs special sessions of the legislature, by not being related to the stated purpose of the special session; (4) that Act 10 violates the home rule amendment to the Wisconsin Constitution by mandating that City of Milwaukee employees make certain contributions to the City of Milwaukee Employes' Retirement System ("Milwaukee ERS") and, in doing so, interfering with the City of Milwaukee's home-rule

---

[6] Fair share agreements, also commonly referred to as "agency-shop agreements," are negotiated arrangements between governmental employers and certified labor organization representatives that require all public employees, including employees who do not wish to join or support a labor organization, to pay the proportional share of the cost of collective bargaining and contract administration. See, e.g., Ronald D. Rotunda & John E. Nowak, 5 Treatise on Constitutional Law, Substance and Procedure, § 20.41(p), at 439 (5th ed.).

authority; (5) that Act 10 violates the Contract Clauses of the United States and Wisconsin Constitutions by unconstitutionally impairing Local 61's vested contractual right to the City of Milwaukee funding the employee share of contributions to the Milwaukee ERS; and (6) that Act 10 violates due process by shifting the responsibility for pension contributions from the City of Milwaukee to members of Local 61, which is a deprivation of property without due process of law.

¶10 In January 2012, the defendants moved for judgment on the pleadings, arguing the circuit court should deny the plaintiffs' motion for summary judgment and dismiss the suit with prejudice. On September 14, 2012, the circuit court issued a decision and order that denied the defendants' motion for judgment on the pleadings and granted partial summary judgment to the plaintiffs. The circuit court held that Act 10 violated: (1) the plaintiffs' rights of association, free speech, and equal protection under both the United States and Wisconsin Constitutions; (2) the home rule amendment to the Wisconsin Constitution; and (3) the Contract Clause of the Wisconsin Constitution. Further, the circuit court held that Act 10 did not violate the special session limiting clause of the Wisconsin Constitution or the constitutional prohibition against taking a property interest without due process of law. Accordingly, the

circuit court concluded that those sections of Act 10 found to be unconstitutional are void and without effect.[7]

¶11 On September 18, 2012, the defendants filed a notice of appeal.  On April 25, 2013, the court of appeals certified the case to this court.

¶12 On June 14, 2013, this court accepted the certification.

## II.  STANDARD OF REVIEW

¶13 The issue before this court is whether certain provisions of Act 10 violate the United States and Wisconsin Constitutions.  The constitutionality of a statute is a question of law that we review de novo.  State v. Randall, 192 Wis. 2d 800, 824, 532 N.W.2d 94 (1995).  All legislative acts are presumed constitutional and we must indulge every presumption to sustain the law.  Id.  Any doubt that exists regarding the constitutionality of the statute must be resolved in favor of its constitutionality.  State ex rel. Hammermill Paper Co. v. La Plante, 58 Wis. 2d 32, 47, 205 N.W.2d 784 (1973).  Consequently, it is insufficient for a party to demonstrate "that the statute's constitutionality is doubtful or that the statute is probably unconstitutional."  Wis. Med. Soc'y, Inc. v. Morgan, 2010 WI 94, ¶37, 328 Wis. 2d 469, 787 N.W.2d 22 (citing State v.

---

[7] On October 10, 2013, the circuit court amended the September 14, 2012 Order to add the third sentence of Wis. Stat. § 111.70(2) to the statutes the court concluded were unconstitutional.  That sentence states: "A general municipal employee has the right to refrain from paying dues while remaining a member of a collective bargaining unit."

<u>Smith</u>, 2010 WI 16, ¶8, 323 Wis. 2d 377, 780 N.W.2d 90). Instead, the presumption can be overcome only if the party establishes the statute's unconstitutionality beyond a reasonable doubt.[8] <u>Id.</u>

¶14 This case also presents questions of statutory interpretation, which this court reviews de novo. <u>Covenant Healthcare Sys., Inc. v. City of Wauwatosa</u>, 2011 WI 80, ¶21, 336 Wis. 2d 522, 800 N.W.2d 906.

### III. DISCUSSION

¶15 This appeal presents four issues: (1) whether Act 10 impermissibly infringes on the associational rights of general employees; (2) whether Act 10 impermissibly infringes on the equal protection rights of represented general employees when compared to non-represented general employees; (3) whether Act 10 violates the home rule amendment to the Wisconsin Constitution by prohibiting the City of Milwaukee from paying the employee share of pension contributions to the Milwaukee ERS; and (4) whether Act 10 violates the Contract Clause of the

---

[8] As this court explained in <u>Ferdon ex rel. Petrucelli v. Wisconsin Patients Comp. Fund</u>, 2005 WI 125, ¶68 n.71, 284 Wis. 2d 573, 701 N.W.2d 440:

The constitutionality of a statute is an issue of law, not fact. The "beyond the reasonable doubt burden of proof" language is, however, reminiscent of an evidentiary burden of proof in criminal cases. The beyond a reasonable doubt burden of proof in a constitutional challenge case means that a court gives great deference to the legislature, and a court's degree of certainty about the unconstitutionality results from the persuasive force of legal argument.

Wisconsin Constitution by significantly impairing the contractual rights of City of Milwaukee employees.

¶16 We address each issue in turn. However, because terminology is critical to interpreting the parties' arguments, it is important that we review certain relevant terms before beginning our analysis.

## A. Terminology

¶17 The heart of this appeal centers on unions, collective bargaining, and the right to associate with others to collectively engage in protected First Amendment activities. These issues are always emotionally charged, especially in turbulent times, but perhaps nowhere are these topics more controversial or sensitive than in the State of Wisconsin. The importance of these questions demands clarity on what precisely is before the court, which in turn requires specificity on our part in the terminology upon which we rely.

¶18 With respect to the term "collective bargaining," we agree with the court of appeals that the following discussion provided by an amicus effectively highlights an important definitional distinction:

> Historically, in the United States the term "collective bargaining" has been used to describe two legally different activities . . . . The first way in which the term has been used has been to describe an activity that is an element of the right of individual citizens to associate together for the purpose of advocating regarding matters of mutual interest or concern, including matters concerning wages and employment conditions. When used in this way the term "collective bargaining" is descriptive of a collective effort and refers to an activity where the party that

10

is the object of the advocacy, the employer, has no legal obligation to respond affirmatively to the advocacy, but may do so voluntarily.

. . . . [This type of "collective bargaining"] is a fundamental right that constitutionally is protected.

The second way in which the term "collective bargaining" has been used is to refer to a statutorily mandated relationship between an association of employees and their employer, by the terms of which an employer and its employees are obligated to negotiate, in "good faith," for the purpose of reaching an agreement regarding the employees' wages and conditions of employment.

Such statutorily recognized "collective bargaining" is subject to legislative modification, for the purpose, at least heretofore, of protecting the employees' fundamental right to bargain with their employer.

Brief for Laborer's Local 236 and AFSCME Local 60 as Amici Curiae at 3, 6-7 (some citations omitted). As the court of appeals did in its certification to this court, we use the term "collective bargaining" in the latter sense; that is, to refer to the statutorily established relationship between an association of public employees and their employer.

¶19 This definition of "collective bargaining" is consistent with the language of Act 10, which defines "collective bargaining" to mean "the performance of the mutual obligation of a municipal employer . . . and the representative of its municipal employees in a collective bargaining unit, to meet and confer at reasonable times, in good faith, with the intention of reaching an agreement, or to resolve questions arising under such an agreement," with respect to wages for general employees. Wis. Stat. § 111.70(1)(a). A "collective

11

bargaining unit" is a "unit consisting of municipal employees" that has been recognized by WERC, pursuant to statute, as qualified for the purpose of collective bargaining. Stat. § 111.70(1)(b).

¶20 Further, under Act 10, for the purpose of collective bargaining, a "representative" may be chosen "by a majority of the municipal employees voting in a collective bargaining unit [and] shall be the exclusive representative of all employees in the unit . . . ." Wis. Stat. § 111.70(4)(d)1. This "representative" could potentially be a "labor organization," which is defined as "any employee organization in which employees participate and which exists for the purpose, in whole or in part, of engaging in collective bargaining with municipal employers . . . ." Wis. Stat. § 111.70(1)(h).

¶21 Unlike the term "labor organization," "union" is not defined under Act 10, though as the court of appeals noted, the parties use the term in two distinct ways. First, the term "union" may refer to what the parties in this case agree is a constitutionally protected association that individuals have the right to form and employers have the right to disregard. However, the term "union" may also refer to the "representative" of a "collective bargaining unit" in the statutorily established relationship between an association of public employees and their employer. For this reason, we follow the practice of the court of appeals and generally avoid use of the term "union." Instead, when referring to the "exclusive certified bargaining agent" of a collective bargaining unit, as that term is

12

understood within the statutory framework established by Act 10, we use the term "certified representative."

¶22  Finally, we refer to a general employee that has chosen to participate in collective bargaining within the statutory framework established by Act 10 as a "represented general employee," and in contrast, the term "non-represented general employee" to refer to a general employee who has declined to participate.

## B.   Associational Claims

¶23  The plaintiffs' central argument on appeal is that the following provisions of Act 10 violate the associational rights of general employees and their certified representatives that are guaranteed under Article I, Sections 3 and 4 of the Wisconsin Constitution:[9]

---

[9] The plaintiffs submit that Article I, Sections 3 and 4 of the Wisconsin Constitution may be interpreted to provide greater protection than the First Amendment to the United States Constitution.  We agree with the court of appeals, however, that the plaintiffs fail to present a developed argument to support their suggestion that Article I, Sections 3 and 4 of the Wisconsin Constitution should confer more expansive protection than its federal counterpart under the particular facts in this case.  Accordingly, in our analysis of the plaintiffs' associational rights claims, we treat the rights protected under the Wisconsin and United States Constitutions to be coextensive. See Lawson v. Hous. Auth. of Milwaukee, 270 Wis. 269, 274, 70 N.W.2d 605, 608 (1955). (holding that Article I, Sections 3 and 4 of the Wisconsin Constitution "guarantee the same freedom of speech and right of assembly and petition as do the First and Fourteenth [A]mendments of the United States [C]onstitution."); see also Cnty. of Kenosha v. C & S Mgmt., Inc., 223 Wis. 2d 373, 388, 588 N.W.2d 236 (1999) ("Wisconsin courts consistently have held that Article I, § 3 of the Wisconsin Constitution guarantees the same freedom of speech rights as the First Amendment of the United States Constitution").

1. The provision prohibiting collective bargaining between municipal employers and the certified representatives for municipal general employee bargaining units on all subjects except base wages. Wis. Stat. § 111.70(4)(mb)1.

2. The provisions limiting negotiated base wage increases to the increase in the Consumer Price Index, unless a higher increase is approved by a municipal voter referendum.[10] Wis. Stat. §§ 66.0506, 111.70(4)(mb)2., and 118.245.

3. The provisions prohibiting fair share agreements that previously required all represented general employees to pay a proportionate share of the costs of collective bargaining and contract administration. Wis. Stat. § 111.70(1)(f) and the third sentence of Wis. Stat. § 111.70(2).

4. The provision prohibiting municipal employers from deducting labor organization dues from the paychecks of general employees. Wis. Stat. § 111.70(3g).

5. The provision requiring annual recertification elections of the representatives of all bargaining units, requiring 51% of the votes of the bargaining unit members (regardless of the number of members who vote), and requiring the commission to assess costs of such elections. Wis. Stat. § 111.70(4)(d)3.

¶24 Whether the plaintiffs' First Amendment challenge to these provisions has any merit is the lynchpin of this appeal. The core of our review is determining whether there is a cognizable First Amendment interest, which establishes the attendant level of scrutiny applied to the legislative judgment behind the requirement. If Act 10 does not infringe on the

---

[10] Act 10 defines "consumer price index change" as "the average annual percentage change in the consumer price index for all urban consumers, U.S. city average, as determined by the federal department of labor, for the 12 months immediately preceding the current date." Wis. Stat. § 111.70(1)(cm).

14

plaintiffs' First Amendment rights, it will be upheld if any rational basis can be found for the contested provisions. See Ysursa v. Pocatello Educ. Ass'n, 555 U.S. 353, 359 (2009).

### i. Freedom of Association Doctrine

¶25 The freedom of association doctrine has two analytically distinct categories: "intrinsic" freedom of association, which protects certain intimate human relationships under the Substantive Due Process component of the Fourteenth Amendment, and "instrumental" freedom of association, which protects associations necessary to effectuate First Amendment rights. See Roberts v. U.S. Jaycees, 468 U.S. 609, 617-18 (1984). The second category of association is the type of freedom of association right the plaintiffs assert has been infringed upon in this case. Regarding this form of association, the United States Supreme Court has "recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment——speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties." Roberts, 468 U.S. at 618; see also Merrifield v. Bd. of Cnty. Comm'rs, 654 F.3d 1073, 1080-81 (10th Cir. 2011); Weber v. City of Cedarburg, 129 Wis. 2d 57, 68, 384 N.W.2d 333 (1986) (noting that "[f]reedom of association is an implied incident of the first amendment guarantees").

### ii. Overview of the Plaintiffs' Associational Arguments

15

¶26 The plaintiffs' argument that Act 10 violates the constitutional right of general employees and their certified representatives to freely associate is premised on a novel legal theory. Therefore, in order to properly address their arguments, we find it helpful to first outline their claims.

¶27 The plaintiffs begin by stressing that no contention is being made that public employees have a constitutional right to collectively bargain.[11] Instead, the plaintiffs argue that, while the State may statutorily restrict the obligation to collectively bargain in good faith, the State may not constitutionally withhold benefits or penalize public employees for exercising their associational rights to self-organization or to select a certified representative for collective bargaining purposes.

¶28 In framing this argument, the plaintiffs rely heavily on Lawson v. Housing Authority of Milwaukee, 270 Wis. 269, 70 N.W.2d 605 (1955). In Lawson, this court held that a federal housing regulation was unconstitutional because it required tenants to relinquish their right to associate with organizations designated as subversive by the United States

---

[11] The plaintiffs' emphasis on this point is prudent. It is well-established law that no constitutional right to collective bargaining exists. See, e.g., Smith v. Ark. State Highway Emp., Local 1315, 441 U.S. 463, 465 (1979) (holding "the First Amendment does not impose any affirmative obligation on the government to listen, to respond or, in this context, to recognize the association and bargain with it"). It is undisputed the State could eliminate collective bargaining entirely without violating the constitutional rights of the plaintiffs.

16

Attorney General in order to remain eligible to continue living in federally aided housing projects.  Lawson, 270 Wis. at 288. This court concluded that a government agency could not condition the privilege of subsidized housing, which lies within the agency's discretion to grant or withhold, on the relinquishment of the constitutionally protected right to associate. Id. at 275.

¶29 Lawson is representative of a body of case law that applies the doctrine of unconstitutional conditions. This doctrine embodies the principle that freedom of speech would be rendered a hollow right if the government was permitted to place, as a condition on the receipt of a governmental benefit, any restrictions on speech it pleased.  Justice Potter Stewart forcefully expressed the importance of this principle in Perry v. Sindermann:

> For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests——especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which (it) could not command directly.' Speiser v. Randall, 357 U.S. 513, 526 . . . . Such interference with constitutional rights is impermissible.

17

408 U.S. 593, 597 (1972); <u>see also</u> <u>United States v. Scott</u>, 450 F.3d 863, 866 (9th Cir. 2006) ("The 'unconstitutional conditions' doctrine . . . limits the government's ability to exact waivers of rights as a condition of benefits, even when those benefits are fully discretionary."); <u>Rumsfeld v. Forum for Academic and Institutional Rights, Inc.</u>, 547 U.S. 47, 59 (2006) ("[T]he government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.") (internal citations omitted). The purpose of the doctrine is to prevent the government from indirectly restricting a constitutional right that it may not otherwise directly impair.

¶30 The plaintiffs raise two related, but allegedly distinct, arguments that, under the unconstitutional conditions doctrine, Act 10 violates their constitutional rights to freedom of association. First, the plaintiffs argue that Act 10 violates the constitutional right to freedom of association by conditioning the receipt of a "benefit"——here, the potential for a general employee or group of general employees to negotiate all issues with the municipal employer, including matters affecting wages and hours——on the relinquishment of the general employees' ability to choose to have a certified representative act on their behalf. Second, the plaintiffs claim that several provisions of Act 10, through cumulative effect, impose organizational and financial penalties on general employees who choose the statutory "privilege" of participating in collective

bargaining for the purpose of requiring their municipal employer to bargain in good faith on base wages.

¶31 Regarding the second argument, the plaintiffs emphasize they are not asserting that each of the contested provisions of Act 10, standing alone, violates associational rights. Instead, the plaintiffs argue it is the impact of the contested provisions of Act 10, taken together, that creates a constitutional violation.

### iii. Limitations on Permissible Collective Bargaining Subjects

¶32 Before the enactment of Act 10, general employees were permitted under MERA to collectively bargain over a broad array of subjects, including wages, working conditions, work hours, and grievance procedures. Act 10 limits collective bargaining between municipal employers and the certified representatives of general employees to the single topic of "total base wages and excludes any other compensation . . . ." Wis. Stat. § 111.70(4)(mb)1. Moreover, Act 10 prohibits collective bargaining for base wage increases that exceed an increase in the Consumer Price Index unless approved in a municipal voter referendum. Wis. Stat. §§ 111.70(4)(mb)2., 66.0506, and 118.245.

¶33 The plaintiffs argue this limitation penalizes general employees who choose to be represented by a certified representative because Act 10 imposes no limitations whatsoever on the terms that non-represented general employees may negotiate with their municipal employers. Consequently, the

19

plaintiffs contend, Act 10 unconstitutionally burdens the associational rights of general employees because they must surrender their association with a certified representative in order to negotiate anything beyond base wages.

¶34 The plaintiffs' argument does not withstand scrutiny. As discussed above, the plaintiffs cite to this court's holding in Lawson, 270 Wis. 269, for the general proposition that the government may not condition the receipt of a discretionary benefit on the relinquishment of a constitutionally protected right. In essence, the plaintiffs rely on Lawson as an illustration of our court applying the unconstitutional conditions doctrine. Beyond Lawson, the plaintiffs cite to numerous cases that support the same doctrinal principle: it is impermissible for the government to condition the receipt of a tangible benefit on the relinquishment of a constitutionally protected right. See, e.g., Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l Inc., 133 S. Ct. 2321, 2328 (2013).

¶35 We do not dispute the existence of the unconstitutional conditions doctrine or its robustness in our jurisprudence. The problem lies in the doctrine's inapplicability to this case, and consequently, the absence of support it provides the plaintiffs' argument.

¶36 Comparing Lawson to the facts of this case swiftly illustrates the problem. In Lawson, this court held that it was unconstitutional for the government to condition the receipt of a benefit (living in a federally aided housing project) on the relinquishment of a constitutionally protected right (the right

20

to associate with organizations that engage in constitutionally protected speech). Here, the plaintiffs argue that it is unconstitutional for the government, through Act 10, to condition the receipt of a benefit (to participate in collective bargaining on the lone topic of base wages) on the relinquishment of a constitutionally protected right (the right to associate with a certified representative in order to collectively bargain on any subject).

¶37 The plaintiffs' logical fallacy rests in the false analogy between the respective rights being relinquished in Lawson and in this case. Without question, in Lawson, the right being relinquished for a benefit——the right to associate with organizations that engage in constitutionally protected speech—— is fundamental in nature and protected under the First Amendment. Here, however, the "right" the plaintiffs refer to—— the right to associate with a certified representative in order to collectively bargain on any subject——is categorically not a constitutional right.

¶38 General employees have no constitutional right to negotiate with their municipal employer on the lone issue of base wages, let alone on any other subject. As the United States Supreme Court made clear:

> [While t]he public employee surely can associate and speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so. . . . [,] the First Amendment does not impose any affirmative obligation on the government to listen, to respond or, in this context, to recognize the association and bargain with it.

21

Smith v. Ark. State Highway Emps., Local 1315, 441 U.S. 463, 465 (1979) (citations omitted).

¶39 The plaintiffs have insisted at every stage of litigation in this case that they are not arguing a constitutional right exists to collectively bargain. It is evident, however, that they really are, for without such a constitutional right, their challenge fails. The plaintiffs' reliance on Lawson hinges on the defendants conditioning the receipt of a benefit on the relinquishment of a constitutional right, but as the plaintiffs acknowledge, collective bargaining——no matter the specific statutory limitations at issue——is not constitutionally protected.

¶40 Put differently, general employees are not being forced under Act 10 to choose between a tangible benefit and their constitutional right to associate. Instead, Act 10 provides a benefit to represented general employees by granting a statutory right to force their employer to negotiate over base wages, while non-represented general employees, who decline to collectively bargain, have no constitutional or statutory right whatsoever to force their employer to collectively bargain on any subject. For this reason, the plaintiffs' argument must be rejected.

¶41 This point is vital and bears repeating: the plaintiffs' associational rights are in no way implicated by Act 10's modifications to Wisconsin's collective bargaining framework. At issue in this case is the State's implementation of an exclusive representation system for permitting public

22

employers and public employees to negotiate certain employment terms in good faith.  It is a prerogative of a state to establish workplace policy in a non-public process in consultation with only select groups——here, an organization selected by the affected workforce itself——and not others. Minn. State Bd. for Cmty. Colls. v. Knight, 465 U.S. 271, 286 (1984) ("[a]ppellees thus have no constitutional right as members of the public to a government audience for their policy views").

¶42 Not at issue in this case is the plaintiffs' constitutional right to associate to engage in protected First Amendment activities.  The plaintiffs remain free to advance any position, on any topic, either individually or in concert, through any channels that are open to the public.  See City of Madison v. Wis. Emp't Relations Comm'n, 429 U.S. 167, 175 (1976) (represented municipal employees have First Amendment right to speak "[w]here the State has opened a forum for direct citizen involvement").  Represented municipal employees, non-represented municipal employees, and certified representatives lose no right or ability to associate to engage in constitutionally protected speech because their ability to do so outside the framework of statutory collective bargaining is not impaired.  Act 10 merely provides general employees with a statutory mechanism to force their employer to collectively bargain; outside of this narrow context, to which the plaintiffs freely concede public employees have no constitutional right, every avenue for petitioning the government remains available.

¶43 General employees may feel inclined to collectively bargain under Act 10 in order to compel their employer to negotiate on the issue of base wages, but this creates no unconstitutional inhibition on associational freedom. See, e.g., Knight, 465 U.S. at 289-90 ("Appellees may well feel some pressure to join the exclusive representation in order to give them . . . a voice . . . on particular issues. . . . Such pressure is inherent in our system of government; it does not create an unconstitutional inhibition on associational freedom"). The defendants are not barring the plaintiffs from joining any advocacy groups, limiting their ability to do so, or otherwise curtailing their ability to join other "like-minded individuals to associate for the purpose of expressing commonly held views . . . ." Knox v. Serv. Emps. Int'l Union, Local 1000, 132 S. Ct. 2277, 2288 (2012).

¶44 Thus, we conclude that the plaintiffs' reliance on Lawson and the unconstitutional conditions doctrine to be misplaced. The limitations on permissible collective bargaining subjects imposed by Act 10 do not force general employees to choose between their constitutional right to associate and the benefit of collective bargaining. Therefore, we hold that Wis. Stat. §§ 111.70(4)(mb), 66.0506, and 118.245 do not violate Plaintiffs' right to freedom of association.

¶45 The dissent suggests we mischaracterize the plaintiffs' argument: "Rather than addressing plaintiff's issue that Act 10 infringes on their constitutional right to organize into a collective bargaining unit, the majority erroneously

24

asserts that plaintiffs are claiming a right to <u>bargain</u> as a collective bargaining unit." Dissent, ¶194. In doing so, the dissent argues we "ignore over a century's worth of jurisprudence and undermine[] a right long held sacred in our state." Dissent, ¶199.

¶46 This sweeping allegation is disappointing, not only because it misconstrues our analysis, but also because it shows confusion over an important area of the law.

¶47 The dissent contends the actual issue presented in this case is whether Act 10 infringes on the associational rights of public employees to organize, as if collective bargaining is a peripheral matter.[12] Having framed the "actual"

---

[12] It is unclear whether the dissent uses the term "collective bargaining unit" as it is defined under Act 10, or if the term is meant to encompass a broader meaning. We assume the dissent does not contend that there is always a constitutional right to organize as a "collective bargaining unit" in a statutory framework created by the state. This would mean the state is constitutionally obligated to create such a framework, which is clearly not true. <u>See</u> <u>Smith</u>, 441 U.S. at 464-65. It is more likely the dissent means that, if a statutory framework has been created by the state for collective bargaining purposes, state employees have a constitutional right to organize within that framework as a "collective bargaining unit."

issue, the dissent contends employees have a "constitutional right to organize as a collective bargaining unit." Dissent, ¶198. But for what purpose?

¶48 Without more information (ascertaining the purpose of the association), it is impossible to determine the argument's validity. The right to associate is not derived from some ethereal notion that individuals be granted the right to organize for organization's sake. Associational rights are rooted in the First Amendment's protection of freedoms of speech and assembly. NAACP v. Alabama, 357 U.S. 449, 460 (1958). Stated differently, the right to engage in activities protected by the First Amendment drives the corresponding right to associate with others in order to engage in those activities. Roberts, 468 U.S. at 622. Thus, the dissent's assertion that employees have an associational right to organize in a collective bargaining group is neither true nor false, because

---

Even adopting this understanding, however, it is unclear how its reliance on NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1 (1937) is appropriate. In support of its proposition that "it has long been established there is a constitutional right to organize as a collective bargaining unit," id., the dissent quotes, with emphasis added, language from Jones & Laughlin: "the right of employees to self-organization and to select representatives of their own choosing for collective bargaining or other mutual protection without restraint or coercion by their employer . . . is a fundamental right." 301 U.S. at 33. Jones & Laughlin does not support the dissent's argument, however, because the case concerned private, as opposed to public, employers. Thus the "right" referred to by the Supreme Court could not have been constitutional. See Laborers Local 236 v. Walker, 2014 WL 1502249, at *8 (citing The Civil Rights Cases, 109 U.S. 3, 17-18 (1883)).

26

it is unclear whether, under the dissent's framing of the issue, the employees are associating for the purpose of engaging in a constitutionally protected activity.

¶49 Needless to say, this ambiguity is purposeful, because to complete the thought would necessarily reveal it is an erroneous statement of the law. The dissent knows the First Amendment does not grant state employees the constitutional right to collectively bargain with their state employer. Thus, in framing its argument, the dissent chooses to ignore that the right to associate is derived from the constitutionally protected activity the group of individuals wants to engage in. No one disputes that the plaintiffs have a constitutional right to organize with others in pursuit of a variety of political, educational, religious, or cultural ends. Id. But this is obviously not what the plaintiffs, or the dissent, seek to establish.

¶50 The plaintiffs seek the right to organize with others to pursue something far more specific: collective bargaining with their employer on a range of issues. And at the risk of belaboring the point, this is not a constitutional right. Smith, 441 U.S. at 464-65.

¶51 The dissent sidesteps this fact by asserting there is a constitutional right to organize in a collective bargaining unit, but leaves unanswered whether the employees are associating for the purpose of engaging in an expressive activity accorded First Amendment protection. This approach does not imbue the plaintiff's claim with merit.

27

¶52 Of course employees have a constitutional right to organize together for expressive purposes, including for the purpose of speaking to their employer on a range of issues. As we explained, supra ¶¶42-43, municipal employees have the constitutional right to form groups, meet with others, organize as one, and speak on any topic. We have emphasized repeatedly that Act 10 does not prohibit any of these things. On the contrary, the State explicitly safeguards these activities.[13]

¶53 It is undisputed that collective bargaining is not constitutionally protected. Indeed, Wisconsin is under no constitutional obligation to collectively bargain at all. Smith, 441 U.S. at 464-65. But the dissent nevertheless maintains that Act 10 has so discouraged participation in Wisconsin's statutory collective bargaining process that it is unconstitutional and accuses us of dodging the question of

---

[13] See Wis. Stat. § 111.70(2) ("Municipal employees have the right of self-organization, and the right to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection").

28

whether Act 10 "impermissibly punish[es] the exercise of the right to associate."[14]  Dissent, ¶207.

¶54 The dissent's accusation is misplaced. Act 10 certainly presents meaningful difficulties for certified representatives, but these difficulties have no bearing on our analysis of the Act's constitutionality.  The First Amendment does not require Wisconsin to "maintain policies that allow certain associations to thrive."  Laborers Local 236 v. Walker, 749 F.3d 628, 639 (7th Cir. 2014).  Likewise, "[a]n organization cannot come up with an associational purpose—even a purpose that involves speech—and then require support from the state in order to realize its goal."  Id.

### iv. Fair Share Agreements, Certification Elections, and Payroll Deductions

¶55 As noted above, the plaintiffs argue that several provisions of Act 10, through cumulative effect, impose

---

[14] Implicit in the dissent's accusation is the belief that statutory frameworks that are based on a model of exclusive representation are unconstitutional if any limits are placed on the subjects upon which employees may collectively bargain.  At present, forty-one states have adopted the federal model of exclusive representation.  See, e.g., Brief for the States of New York, Arkansas, et. al. as Amici Curiae in Support of Respondents, Harris v. Quinn, (2013) (No. 11-681) 2013 WL 6907713, at *8.  Of these, a significant number have imposed limitations on the subjects of collective bargaining.  See, e.g., Ind. Code 20-29-6-4.5; Mich. Comp. Laws § 380.1248; 115 Ill. Comp. Stat. 5/4.5; 2011 N.J. Laws ch. 78; see also Martin H. Malin, Does Public Employee Collective Bargaining Distort Democracy? A Perspective from the United States, 34 Comp. Lab. L. & Pol'y J. 277, 285-88 (2013).  We note that adopting the dissent's constitutional argument would effectively repeal a vast amount of legislation in states across the nation.

organizational and financial penalties on general employees who choose the statutory "privilege" of collective bargaining for the purpose of requiring their employer to negotiate in good faith on base wages. Specifically, the plaintiffs contend the following provisions of Act 10, taken together, impose a constitutionally impermissible burden on general employees: (1) the prohibition of fair share agreements; (2) the requirement of mandatory annual certification elections; and (3) the prohibition on payroll deductions of labor organization dues from the wages of general employees. The plaintiffs argue these features of Act 10 unconstitutionally interfere with associational rights by burdening and penalizing general employees who elect to collectively bargain. The plaintiffs claim that general employees will eventually surrender the exercise of their associational rights rather than suffer the burdens placed upon them.

¶56 The plaintiffs cite to no authority supporting their contention that constitutional analysis functions in this manner; i.e., that courts must consider several, otherwise constitutional, statutory provisions to determine if they collectively amount to a constitutional infirmity. Nevertheless, we indulge the plaintiffs in this instance and separately consider the constitutionality of Act 10's "cumulative impact and effect." We first examine each contested provision in isolation. After assessing each challenged part, we examine the contested provisions operating as a whole.

a. Fair Share Agreements

30

¶57 Fair share agreements are negotiated arrangements between municipal employers and certified representatives that require all general employees, including non-represented general employees, to pay the proportional share of the cost of collective bargaining and contract administration. Act 10 prohibits these agreements. See Wis. Stat. § 111.70(1)(f), (2). The plaintiffs argue this creates a financial burden on certified representatives and represented general employees to bear the full cost of collective bargaining for the benefit of the entire bargaining unit, while allowing non-represented general employees in the bargaining unit to enjoy the benefits of representation as "free riders." For the certified representative and its members to choose the statutory "privilege" of collective bargaining, the plaintiffs argue they must accept the financial penalty as a condition of their associational choices to serve as the certified representative and be represented general employees. The plaintiffs contend these burdens will dissuade labor organizations from becoming certified representatives and general employees from becoming represented general employees, and are therefore unconstitutional.

¶58 The plaintiffs' argument is unconvincing. First, labor organizations "have no constitutional entitlement to the fees of nonmember-employees." Davenport v. Wash. Educ. Ass'n, 551 U.S. 177, 185 (2007). Further, as the United States Supreme Court recently reaffirmed in Harris v. Quinn, fair share agreements "unquestionably impose a heavy burden on the First

Amendment interests" of municipal employees who do not wish to participate in the collective bargaining process.  Harris v. Quinn, 573 U.S. ___, 134 S. Ct. 2618, 2643 (2014); see also Knox, 132 S. Ct. at 2291 ("By authorizing a union to collect fees from nonmembers . . . our prior decisions approach, if they do not cross, the limit of what the First Amendment can tolerate").[15]

¶59 Even setting aside the question of whether fair share agreements are constitutionally permissible,[16] it is evident that

_____

[15] These observations are not unexpected, considering that the presence of a right to freedom of association "plainly presupposes a freedom not to associate." Roberts v. United States Jaycees, 468 U.S. 609, 623 (1984); see also Hudson v. Chicago Teachers Union Local No. 1, 743 F.2d 1187, 1193 (7th Cir. 1984), aff'd sub nom. Chicago Teachers Union, Local No. 1, AFT, AFL-CIO v. Hudson, 475 U.S. 292 (1986) ("The particular freedom of association we are speaking of——the freedom that is ancillary to freedom of speech——has a negative as well as a positive dimension").  To compel an individual to pay fees to support an organization that engages in political and economic activities, which the individual has no interest in supporting, raises self-apparent First Amendment concerns.

[16] The dissent notes that the United States Supreme Court affirmed in Harris v. Quinn, 573 U.S. ___, 134 S. Ct. 2618, 2638 (2014), that fair share agreements for "full-fledged state employees" are constitutionally permissible. Dissent, ¶206 n.8. To say the least, the dissent puts a positive spin on Harris's impact on the constitutional legitimacy of fair share agreements.  Harris concluded that the First Amendment prohibits the collection of fees from Illinois home-care personal assistants who do not want to join or support the labor organization representing them.  It is true Harris is not directly applicable to this case because the employees at issue in Harris, while government-funded, were not "full-fledged state employees." 134 S. Ct. at 2638.  Nevertheless, Harris clearly signals that fair share agreements are constitutionally suspect beyond the context of quasi-State employees.

the prohibition of fair share agreements does not infringe on the associational rights of general employees or certified representatives in any respect. The First Amendment does not compel the government to subsidize speech. Ysursa, 555 U.S. at 357. By logical extension, the First Amendment does not compel the government to compel its employees to subsidize speech.

¶60 The plaintiffs' argument that the financial cost involved in participating in collective bargaining acts as an unconstitutional "burden" on general employees and certified representatives is premised on a faulty assumption: if the State creates a benefit for which there is no constitutional right, it will nevertheless violate the First Amendment rights of those

---

In Harris, the State of Illinois pointed to the Supreme Court's holding in Abood v. Detroit Bd. of Educ., 431 U.S. 209 (1977), to argue the fair share agreement at issue was permissible. In Abood, the Supreme Court upheld a fair share agreement requiring public school teachers in Detroit to pay dues to the labor organization representing them, even though they opposed public sector collective bargaining. 431 U.S. at 211. Harris illustrates that time has not been kind to Abood. Since it was decided in 1977, the Supreme Court's criticism of Abood's holding and underlying rationale has become increasingly pointed. Two years ago, in Knox v. Serv. Emps. Int'l Union, Local 1000, the Supreme Court noted that Abood was "something of an anomaly." Knox, 132 S. Ct. 2277, 2290 (2012). Harris goes further in expressing disapproval of Abood, explaining at length why its analysis "is questionable on several grounds." Harris, 134 S. Ct. at 2621. The holding of Abood may be alive in our jurisprudence, but it is not well. As Justice Alito broadly stated in concluding the majority's analysis in Harris, "if we accepted Illinois' argument, we would approve an unprecedented violation of the bedrock principle that, except perhaps in the rarest of circumstances, no person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support." Id. at 2644.

who accept that benefit if accepting that benefit somehow "burdens" a non-constitutionally protected activity. A successful constitutional challenge cannot be rooted in such an unfounded premise.

¶61 We conclude that Wis. Stat. § 111.70(1)(f) and the third sentence of § 111.70(2), examined in isolation, do not violate the plaintiffs' right to freedom of association.

b. Certification Elections

¶62 Prior to Act 10, general employees could petition WERC to hold an election to designate a labor organization as the general employees' certified representative. The voting requirement for certification was a simple majority of employees in the collective bargaining unit. Once a labor organization was certified, it would remain the general employees' certified representative until thirty percent of the employees requested a decertification election.

¶63 Act 10, however, requires the certified representative of a collective bargaining unit to undergo an annual certification election in which the representative must obtain the vote of an absolute majority of the general employees in the bargaining unit to retain status as the employees' certified representative. Wis. Stat. § 111.70(4)(d)3.b. Further, Act 10 requires that the certified representative pay the cost of administering the related certification elections. Id.

¶64 The plaintiffs allege that the certification election requirements imposed by Act 10 place "organizational penalties"

34

on certified representatives and general employees that will eventually dissuade participation in collective bargaining.

¶65 The plaintiffs' argument again conflates collective bargaining rights, which are statutorily guaranteed, with associational rights, which are constitutionally protected. Act 10's certification election provisions merely specify the statutory requirements a certified representative must satisfy in order to exclusively negotiate on behalf of the general employees in its bargaining unit. No plausible argument can be made that these provisions, or the "burdens" they impose on certified representatives, infringe on the rights of general employees to freely associate. The certification election provisions do not bar or obstruct general employees from joining other "like-minded individuals to associate for the purpose of expressing commonly held views." Knox, 132 S. Ct. at 2288. Instead, the provisions at issue outline the requirements and rights of certified representatives that wish to, on behalf of its bargaining unit employees, compel the government to participate in statutory collective bargaining.

¶66 Certification requirements for certified representatives have existed in Wisconsin's labor laws since

1959.[17]   The certification requirements imposed by Act 10 are certainly more stringent than under the prior laws, but it is impossible for these increased "organizational penalties" to violate the plaintiffs' associational rights, when there are no associational rights at stake.   The certification requirements apply solely to collective bargaining, which is wholly distinct from an individual's constitutional right to associate. Therefore, we hold that Wis. Stat. § 111.70(4)(d)3.b., examined in isolation, does not infringe on the plaintiffs' constitutional right to associate.

### c. Payroll Deductions

¶67 Prior to Act 10, municipal employers could deduct labor organization dues from the paychecks of general employees at the employee's request.   Act 10 prohibits this practice. Wis. Stat. § 111.70(3g).   The plaintiffs argue this prohibition hampers certified representatives and general employees both organizationally and financially, creating an unconstitutional burden on their associational rights.

¶68 The United States Court of Appeals for the Seventh Circuit recently considered a separate legal challenge to Act 10 and, in so doing, examined the constitutionality of Act 10's

---

[17] The Wisconsin State Employees Association was organized in 1932.   In 1936, the association evolved into the American Federation of State, County and Municipal Employees ("AFSCME"). In 1959, the legislature enacted a law giving state municipal employees the statutory right to bargain collectively with their employers.   This law——Chapter 509, Laws of 1959, as amended over the years——formed the basis of MERA, which is administered by WERC.

prohibition on payroll deductions for labor organizations. The court observed:

> The Bill of Rights enshrines negative liberties. It directs what government may not do to its citizens, rather than what it must do for them. While the First Amendment prohibits "plac[ing] obstacles in the path" of speech . . . nothing requires government to "assist others in funding the expression of particular ideas, including political ones," Ysursa, 555 U.S. at 358, 129 S.Ct. 1093. . . . Thus, even though "publicly administered payroll deductions for political purposes can enhance the unions' exercise of First Amendment rights, [states are] under no obligation to aid the unions in their political activities." Ysursa, 555 U.S. at 359, 129 S.Ct. 1093.
>
> In Ysursa, the Supreme Court squarely held that the use of a state payroll system to collect union dues from public sector employees is a state subsidy of speech. Id. As the Court explained, "the State's decision not to [allow payroll deduction of union dues] is not an abridgment of the unions' speech; they are free to engage in such speech as they see fit." . . . Like the statutes in these cases, Act 10 places no limitations on the speech of general employee unions, which may continue speaking on any topic or subject.

Wis. Educ. Ass'n Council v. Walker, 705 F.3d 640, 645-46 (7th Cir. 2013). While the Seventh Circuit's analysis of Act 10 is not binding on this court, we find no reason to disagree with

its clear and rational articulation of the law.[18] As explained by the Seventh Circuit, the prohibition on an employer's authorization to deduct labor organization dues from the paychecks of general employees does not infringe on an employee's constitutional right to associate. Further, this prohibition does not penalize employees because no constitutional right exists for the deduction of dues from a paycheck to support membership in a voluntary organization. See Bailey v. Callaghan, 715 F.3d 956, 958 (6th Cir. 2013) (noting the prohibition on payroll deductions "does not restrict the unions' speech at all: they remain free to speak about whatever

---

[18] The dissent distinguishes Wis. Educ. Ass'n Council, 705 F.3d 640, from this case on the basis that it "examined whether Act 10 burdened the free speech rights of collective bargaining units" rather than "the right of individuals to organize in a collective bargaining unit." Dissent, ¶201, n.7. We are surprised the dissent finds this distinction meaningful, given that "[t]he particular freedom of association we are speaking of [is] the freedom that is ancillary to freedom of speech . . . ." Hudson v. Chicago Teachers Union Local No. 1, 743 F.2d 1187, 1193 (7th Cir. 1984), aff'd sub nom. Chicago Teachers Union, Local No. 1, AFT, AFL-CIO v. Hudson, 475 U.S. 292 (1986). In fact, as we explained supra ¶25, the reason the right to association is constitutionally protected is because it serves as a means of preserving other First Amendment activities, such as free speech. Roberts, 468 U.S. at 618; see also Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 68 (2006) (explaining that First Amendment protection extends to associational rights because "[t]he right to speak is often exercised most effectively by combining one's voice with the voices of others").

Regardless, though we view this as a distinction without a difference, we note that the Seventh Circuit recently held in Laborers Local 236, 749 F.3d at 639, that "none of Act 10's proscriptions—individually or cumulatively—infringe" the associational rights of labor organizations or its members.

they wish. Moreover, nothing in the First Amendment prevents a State from determining that its political subdivisions may not provide payroll deductions for union activities . . . .") (internal quotations omitted).

¶69 Accordingly, we hold that Wis. Stat. § 111.70(3g), examined in isolation, does not infringe on the plaintiffs' constitutional right to associate.

### d. Cumulative Burden

¶70 We have held that, examined in isolation, each of the contested provisions of Act 10 does not violate the plaintiffs' associational rights. While we do not concede that the cumulative approach advocated by the plaintiffs is either correct or necessary, we now conclude that, even viewed together, the contested provisions of Act 10 are not constitutionally infirm. As we discussed above, each provision of Act 10 that the plaintiffs contend infringes upon the associational rights of certified representatives and general employees does not, in fact, do so, because in each instance, there is no constitutional associational right implicated.

¶71 Viewing the provisions as a whole does not change our analysis. Each of the plaintiffs' arguments fails for largely the same reason: collective bargaining requires the municipal employer and the certified representative to meet and confer in good faith. Wis. Stat. § 111.70(1)(a). The Wisconsin Constitution does not. Indeed, it is uncontested that it would be constitutional for the State of Wisconsin to eliminate collective bargaining entirely.

39

¶72 Thus, the plaintiffs' contention that several provisions of Act 10, which delineate the rights, obligations, and procedures of collective bargaining, infringe upon general employees' constitutional right to freedom of association is unfounded. No matter the limitations or "burdens" a legislative enactment places on the collective bargaining process, collective bargaining remains a creation of legislative grace and not constitutional obligation. The restrictions attached to the statutory scheme of collective bargaining are irrelevant in regards to freedom of association because no condition is being placed on the decision to participate. If a general employee participates in collective bargaining under Act 10's statutory framework, that general employee has not relinquished a constitutional right. They have only acquired a benefit to which they were never constitutionally entitled.

¶73 The First Amendment cannot be used as a vehicle to expand the parameters of a benefit that it does not itself protect. For the reasons articulated above, we conclude that Wis. Stat. §§ 111.70(4)(mb), 66.0506, 118.245, 111.70(1)(f), 111.70(3g), 111.70(4)(d)3 and the third sentence of § 111.70(2) do not violate the plaintiffs' associational rights.

C. Equal Protection

¶74 Having concluded that Act 10 does not violate the right to freedom of association under the First Amendment, we next consider whether the Act offends the equal protection

40

provisions of the Wisconsin or United States Constitutions.[19] The plaintiffs also argue that Act 10 violates the equal protection rights of general employees and certified representatives through the disparate treatment of general employees who choose to associate with a certified representative and general employees who do not. In considering this argument, we first note that public employees are not a protected class. We also recognize that this challenge implicates no fundamental rights because, as explained above, the right to collectively bargain is not the same as the plaintiffs' constitutional right to freedom of association. Accordingly, rational basis review governs in our examination of

---

[19] Article I, Section 1 of the Wisconsin Constitution provides:

> All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed.

In our analysis of the plaintiffs' equal protection claims, we treat the rights protected under the Wisconsin and United States Constitutions as coextensive. See C & S Mgmt., 223 Wis. 2d at 393-94 (noting that Article I, Section 1 of the Wisconsin Constitution and the Fourteenth Amendment to the United States Constitution afford "substantially equivalent" limitations on legislative power).

the plaintiffs' equal protection claims.[20]  We uphold a legislative act under that standard if it furthers a legitimate interest and if the challenged classification is rationally related to achieving the interest.  See Smith, 323 Wis. 2d 377, ¶12 ("When neither a fundamental right has been interfered with nor a suspect class been disadvantaged as a result of the classification, the legislative enactment must be sustained unless it is patently arbitrary and bears no rational relationship to a legitimate government interest.") (internal quotation marks omitted).

¶75 As the court of appeals observed, and the plaintiffs concede, the merit of the plaintiffs' equal protection argument hinges on the merit of their associational rights claim.  Having rejected the premise that Act 10 implicates a fundamental right, the plaintiffs' equal protection claim necessarily fails under rational basis review.

¶76 While courts express various iterations of the rational basis test, we have often quoted the United States Supreme Court's articulation in McGowan v. Maryland, 366 U.S. 420, 425-26 (1961):

---

[20] Generally, when considering an equal protection challenge, this court will uphold the statute if we find that the legislative classification is supported by a rational basis. Wis. Prof'l Police Ass'n v. Lightbourn, 2001 WI 59, ¶221, 243 Wis. 2d 512, 627 N.W.2d 807.  This court will employ strict scrutiny in our examination of an equal protection claim only if the legislative classification interferes with a fundamental right or "operates to the peculiar disadvantage of a suspect class."  Castellani v. Bailey, 218 Wis. 2d 245, 261-62, 578 N.W.2d 166.

42

> [The Equal Protection Clause] permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.

This court's presumption that all legislative acts are constitutional places a heavy burden on a party challenging the statute's constitutionality under rational basis review. See Ferdon ex rel. Petrucelli v. Wisconsin Patients Comp. Fund, 2005 WI 125, ¶¶67-68, 284 Wis. 2d 573, 701 N.W.2d 440. If any doubt exists as to the statute's constitutionality, it must be resolved in favor of constitutionality. Id. To prevail, a challenger must establish that the law is unconstitutional beyond a reasonable doubt. Id.

¶77 We will uphold a statute against an equal protection challenge if the classification bears a rational relationship to some legitimate government interest. Smith, 323 Wis. 2d 377, ¶12. Notably, this requires no declaration by the State about the law's purpose, nor evidence supporting the law's rationality. The actual motivations of the enacting governmental body are irrelevant. FCC v. Beach Communications, 508 U.S. 307, 315 (1993). Instead, "[i]n evaluating whether a legislative classification rationally advances the legislative objective, 'we are obligated to locate or, in the alternative, construct a rationale that might have influenced the legislative

43

determination.'" Ferdon, 284 Wis. 2d 573, ¶74 (citing Aicher ex rel. LaBarge v. Wisconsin Patients Comp. Fund, 2000 WI 98, ¶57, 237 Wis. 2d 99, N.W.2d 849).

¶78 The plaintiffs' equal protection argument focuses on two distinct ways in which employees are disparately treated: first, under Act 10, general employees who choose to associate with a certified representative are limited to negotiating on the sole issue of base wages. General employees who do not associate with a certified representative, however, face no limitations on what they may negotiate with their employer. Second, Act 10 prohibits municipal employers from deducting labor organization dues from the paychecks of general employees who choose to associate with a certified representative. General employees that belong to other organizations, however, face no similar prohibition in having membership dues from those organizations deducted from their paychecks.

¶79 We will address each challenged classification in turn.

i. Collective Bargaining Limitations

¶80 The plaintiffs argue that Act 10 violates general employees' rights to equal protection under the law because the law limits represented general employees to negotiating base wages, while non-represented general employees have no limitations in what they may negotiate with their employer.

¶81 The fact that Act 10 creates two classes of public employees by whether they elect to have a certified representative for collective bargaining purposes denies no

44

employee equal protection under the law. As the defendants accurately point out, if the plaintiffs were correct in their argument, _any_ public sector bargaining framework that resulted in different treatment for represented and non-represented general employees would be unconstitutional. This means if the plaintiffs' equal protection argument were correct, any collective bargaining scheme would be constitutionally infirm.

¶82 Legislative acts must be upheld when this court can conceive of any facts upon which the legislation reasonably could be based. _Aicher_, 237 Wis. 2d 99, ¶66. The Seventh Circuit determined, and we agree: Act 10's requirement that base wage increases above the cost of living require a municipal voter referendum for certified bargaining agents "promote flexibility in state and local government budgets by providing public employers more leverage in negotiations." _Wis. Educ. Ass'n Council_, 705 F.3d at 654. We conclude this classification scheme rationally advances the legislative purpose of improving Wisconsin's fiscal health through enhanced control over public expenditures.

ii. Payroll Deduction Prohibitions

¶83 The plaintiffs also argue that Act 10 violates general employees' rights to equal protection under the law because the law prohibits employers from deducting labor organization dues from the paychecks of general employees, while permitting employers to deduct membership dues for other organizations.

¶84 As we noted above, because Act 10's payroll deduction prohibition does not implicate the plaintiffs' associational

45

rights, we examine this provision of Act 10 under rational basis review.

¶85  Act 10's prohibition on deducting labor organization dues could be founded on the defendants' rational belief that labor organizations are costly for the State.  The State has a legitimate interest, especially in the current economic climate, in curtailing costs where possible.  The prohibition on paycheck deductions furthers this interest by imposing a burden that affects the influence of labor organizations over general employees who are less enthusiastic about participating in the collective bargaining process.  See Wis. Educ. Ass'n Council, 705 F.3d at 656-57.  This provision of Act 10 does not prohibit general employees from paying labor organization dues; it merely requires that employees show the initiative to pay them on their own.

¶86 Accordingly, we conclude Act 10's collective bargaining limitations and payroll deduction prohibitions survive the plaintiffs' equal protection challenge under rational basis review.

D. Wisconsin Stat. § 62.623 and the Home Rule Amendment

¶87 The Milwaukee ERS[21] requires that plan members contribute, or have contributed on their behalf, 5.5% of their earnable compensation.[22] Milwaukee, Wis. Charter Ordinance § 36-08-7. Prior to the enactment of Act 10, the City of Milwaukee and participating city agencies funded these member contributions on behalf of each participating employee hired prior to January 1, 2010, while employees hired on or after January 1, 2010, had to contribute 5.5% of their earnable

[21] The Milwaukee Employe Retirement System was established by ch. 396, Laws of 1937. In 1947, the legislature transferred the governance, funding, and administration of the retirement system to the City of Milwaukee. Subsequently, pursuant to Wis. Stat. § 66.0101, the City of Milwaukee enacted Chapter 36 of the Milwaukee Charter Ordinance, which has served as the governing law of the Milwaukee ERS. The Milwaukee ERS provides retirement and disability benefits, counseling and other services to approximately 27,000 members. The Milwaukee ERS is primarily responsible for administering retirement and disability benefits for employees of the City of Milwaukee, Milwaukee Metropolitan Sewerage District, the Wisconsin Center and the Milwaukee Housing and Redevelopment Authorities, non-certified staff of Milwaukee Public Schools and some employees of the Milwaukee Area Technical College. The ERS pension trust fund is a defined benefit pension plan that provides a monthly benefit to retirees after reaching a minimum retirement age depending upon employment history.

[22] Earnable compensation is defined as essentially regular base salary. Milwaukee, Wis. Charter Ordinance § 36-02-12. The Milwaukee ERS also requires varying levels of contribution depending on the employee's specific occupation. For general employees, the required contribution is 5.5%, but for police officers, fire fighters, and elected officials, it is 7%. Id. § 36-08-7. However, because employees classified as "public safety employees" under Act 10 are unaffected by Wis. Stat. § 62.623, the plaintiffs' argument centers on those plan members of the Milwaukee ERS classified as "general employees."

compensation on their own behalf. See id. Act 10 created Wis. Stat. § 62.623, which prohibits the City of Milwaukee from paying on behalf of a general employee the employee share of required contributions to the Milwaukee ERS.[23]

_____

[23] Wisconsin Stat. § 62.623 provides, in part:

Beginning on July 1, 2011, in any employee retirement system of a 1st class city, except as otherwise provided in a collective bargaining agreement entered into under subch. IV of ch. 111 and except as provided in sub. (2), employees shall pay all employee required contributions for funding benefits under the retirement system. The employer may not pay on behalf of an employee any of the employee's share of the required contributions.

Every Wisconsin city is assigned to one of four classes. Wisconsin statutes divide cities into the four classes, based on population, as follows:

- First class cities, with a population of 150,000 or over.

- Second class cities, with a population of at least 39,000, but less than 150,000.

- Third class cities, with a population of at least 10,000, but less than 39,000.

- Fourth class cities, with a population of less than 10,000.

¶88 The plaintiffs[24] argue that Wis. Stat. § 62.623 violates the "home rule amendment," Wis. Const. art. XI, § 3(1).

¶89 Cities are creatures of the state legislature and have no inherent right of self-government beyond the powers expressly granted to them.[25] See, e.g., Van Gilder v. City of Madison, 222 Wis. 58, 73, 268 N.W. 108 (1936) (citing City of Trenton v. New

---

Wis. Stat. § 62.05(1). The classes are primarily meant to be population-based distinctions, but a city does not move to a higher class automatically if its population increases past a certain population threshold. In addition to having the necessary population, the city must make any requisite modifications in government and a proclamation must be issued by the mayor or city manager and publish this change according to law. Wis. Stat. § 62.05(2). For example, Madison has a sufficient population to meet the first-class city population requirement, but for purposes of statutes related to cities, Madison remains a city of the second class. Milwaukee is currently Wisconsin's only first-class city. Susan C. Paddock, The Changing World of Wisconsin Local Government, 1997-98 Wisconsin Blue Book 119.

[24] Wisconsin Stat. § 62.623 applies to only first-class cities. Consequently, Local 61 is the sole challenger for the home rule and contract clause issues. However, for the sake of consistency, we will still refer to Local 61 as "the plaintiffs" in Sections 3 and 4 of this opinion.

[25] As we explained in City of Trenton v. New Jersey, 262 U.S. 182, 187 (1923):

In the absence of state constitutional provisions safeguarding it to them, municipalities have no inherent right of self-government which is beyond the legislative control of the state. A municipality is merely a department of the state, and the state may withhold, grant or withdraw powers and privileges as it sees fit. However great or small its sphere of action, it remains the creature of the state exercising and holding powers and privileges subject to the sovereign will.

49

*Jersey*, 262 U.S. 182, 187 (1923)). Adopted in 1924, the home rule amendment was intended to provide cities and villages[26] with greater autonomy over local affairs.[27] The home rule amendment, Wis. Const. art. XI, § 3(1) provides:

> Cities and villages organized pursuant to state law may determine their local affairs and government, subject only to this constitution and to such enactments of the legislature of statewide concern as with uniformity shall affect every city or every village. The method of such determination shall be prescribed by the legislature.

---

[26] Wisconsin's cities and villages are sometimes referred to as "incorporated" municipalities or "municipal corporations." This reflects to some extent their legal status. Early in state history, villages and cities were incorporated by special acts of the legislature. In 1871 and 1892, constitutional amendments were adopted prohibiting the legislature from incorporating any city, village, or town by special act. *See* Wis. Const. art. IV, § 31. As a result, cities and villages are now incorporated according to general incorporation laws, and the basic outline of city and village government is set forth in statutes (sometimes referred to as "general charter" laws). Wis. Stat. chs. 61 (villages) and 62 (cities).

The home rule amendment does not apply to counties in Wisconsin. However, counties have home rule protection pursuant to statute, though it is more limited than the protection afforded by constitutional municipal home rule. *See* Wis. Stat. § 59.03(1); *Jackson Cnty. v. DNR*, 2006 WI 96, ¶17, 293 Wis. 2d 497, 717 N.W.2d 713.

[27] Generally, a city or village is statutorily required to enact a charter ordinance in order to override a state law as it relates to the local affairs and government of the city or village. *See* Wis. Stat. § 66.0101. It is uncontested in this case that the City of Milwaukee properly enacted a charter ordinance and, consequently, has properly exercised its home rule authority in governing, funding, and administrating the Milwaukee ERS. Accordingly, our discussion is limited to the question of whether the state legislature, by enacting Wis. Stat. § 62.623, has impermissibly infringed on the City of Milwaukee's home rule authority.

¶90 As the court of appeals noted in its certification to this court, the crux of this challenge lies in the parties' disagreement on the proper legal test to employ in determining whether a legislative enactment violates the home rule amendment.

¶91 The defendants argue that our case law holds, as a threshold matter, that if a legislative enactment applies uniformly statewide, it cannot violate the home rule amendment. In other words, the defendants contend the determination of whether a legislative enactment is primarily a statewide or local concern is irrelevant, so long as the legislation "with uniformity shall affect every city or village." Wis. Const. art. XI, § 3(1).[28]

¶92 In stark contrast to the defendants' position, the plaintiffs contend that, in order to comply with the home rule amendment, a legislative enactment must (1) affect a matter of statewide concern, and must (2) apply with uniformity statewide. Further, the plaintiffs argue that if a home rule municipality has enacted a charter ordinance that relates to a matter of purely local concern, any conflicting state statute must be found unconstitutional.

¶93 In short, the parties dispute whether a uniformly applied state law may permissibly preempt the charter ordinance

---

[28] The conditional phrase in the home rule amendment that state legislation "with uniformity shall affect every city or village" is frequently referred to in case law and secondary authorities as the "uniformity requirement."

51

of a home-rule city if the ordinance concerns a matter of purely local affairs.

¶94 Generally, under our analytical framework for home rule challenges, we first establish the character of the legislative enactment at issue, and only then consider whether the uniformity requirement is satisfied if the state law concerns a matter of primarily local affairs.  However, this home rule challenge is atypical because the heart of the parties' dispute is not limited to the application of the relevant law to the facts presented; instead, it centers on the parties' wildly divergent positions on the applicable analytical framework.  In their certification to this court, the court of appeals requested that we clarify the proper legal test to apply in constitutional home rule challenges.

¶95 In order to address the court of appeals' request for clarity and resolve the parties' arguments, we first outline the relevant analytical framework.  In so doing, we establish that, under our controlling precedent, no merit exists in the plaintiffs' contention that the legislative enactment at issue in a home rule challenge must be a matter of statewide concern and uniformly applied statewide to withstand constitutional scrutiny. After clarifying the proper analytical framework, we apply it to the facts of this case and hold that Wis. Stat. § 62.623 primarily concerns a matter of statewide concern and does not violate the home rule amendment to the Wisconsin Constitution.  Accordingly, we need not go any further to

conclude that Wis. Stat. § 62.623 survives the plaintiffs' home rule challenge.

### i. Analytical Framework

¶96 For the purposes of our home rule analysis, we have outlined three areas of legislative enactment: those that are (1) exclusively a statewide concern; (2) exclusively a local concern; or (3) a "mixed bag." See, e.g., Adams v. State Livestock Facilities Siting Review Bd., 2012 WI 85, ¶30, 342 Wis. 2d 444, 820 N.W.2d 404 (citing State ex rel. Michalek v. LeGrand, 77 Wis. 2d 520, 527, 253 N.W.2d 505 (1977)).

¶97 If the legislative enactment concerns a policy matter that is exclusively of statewide concern, we have held that the home rule amendment grants no city or village authority to regulate the matter. Van Gilder, 222 Wis. at 84 (holding that "[w]hen the Legislature deals with matters which are primarily matters of state-wide concern, it may deal with them free from any restriction contained in the home rule amendment").[29]

¶98 Conversely, if the legislative enactment concerns a matter of purely local affairs, home rule municipalities may regulate those local matters and, under the home rule amendment, state legislation that would preempt or make that municipal regulation unlawful, unless uniformly applied statewide, is

---

[29] However, the home rule amendment does not prohibit the legislature from delegating to municipalities the statutory authority to regulate particular areas that are primarily matters of statewide concern. See Wisconsin's Environmental Decade, Inc. v. Dept. of Natural Res., 85 Wis. 2d 518, 533, 271 N.W.2d 69 (1978).

prohibited.  Michalek, 77 Wis. 2d at 529 (holding that "[a]s to an area solely or paramountly in the constitutionally protected area of 'local affairs and government,' the state legislature's . . . preemption or ban on local legislative action would be unconstitutional").

¶99  However, notwithstanding the plaintiffs' assertions to the contrary, our case law has consistently held that the legislature may still enact legislation that is under the home rule authority of a city or village if it with uniformity "affect[s] every city or every village."  Wis. Const. art. XI, § 3(1);  see, e.g., Adams, 342 Wis. 2d 444, ¶¶29, 36 (noting that, while municipalities may adopt ordinances regulating issues of both statewide and local concern, the legislature has the authority to withdraw this power by creating uniform state standards that all political subdivisions must follow); City of West Allis v. Cnty. of Milwaukee, 39 Wis. 2d 356, 366, 159 N.W.2d 36 (1968) (explaining that when "the matter enacted by the legislature is primarily of local concern, a municipality can escape the strictures of the legislative enactment unless the enactment applies with uniformity to every city and village."); Van Gilder, 222 Wis. at 84 (stating that "when the Legislature deals with local affairs and government of a city, if its act is not to be subordinate to a charter ordinance, the act must be one which affects with uniformity every city"); State v. Baxter, 195 Wis. 437, 449, 219 N.W. 858 (1928) (explaining that "where legislation of a city enacted within the scope of its home rule powers comes in conflict with state

54

legislation, the legislation of the city prevails over the state legislation, unless the state legislation affects uniformly every city of the state"). If the state legislation concerning purely local affairs does not meet the uniformity requirement, cities and villages may exempt themselves from the law by adopting a charter ordinance to that effect. See West Allis, 39 Wis. 2d at 367-68.

¶100 Finally, in cases where the legislative enactment touches on an issue that concerns both statewide and local government interests (a "mixed bag"), the court must first determine whether the matter is primarily a matter of statewide or local concern. After making this determination, the court then applies the corresponding test. See, e.g., Michalek, 77 Wis. 2d at 528 (concluding the matter at issue was paramountly local in nature and, accordingly, treating it as being of local concern for purposes of home rule analysis); State ex rel. Brelsford v. Ret. Bd. of Policemen's Annuity & Benefit Fund of Milwaukee, 41 Wis. 2d 77, 86, 163 N.W.2d 153 (1968) (citation omitted) (reviewing the consistency of two home rule cases and noting "the court was confronted with a subject of legislation which partook both of the nature of a 'local affair' and also that of 'state-wide concern,' but in the former case it held that the matter was primarily a 'local affair,' while the latter decision held that the 'state-wide concern' feature was paramount."); City of Fond du Lac v. Town of Empire, 273 Wis. 333, 338-39, 77 N.W.2d 699 (1956) (explaining that "where a matter affects the interests of local residents as well as the

55

interests of the people in other areas of the state, the test to be applied in resolving the matter is that of paramount interest . . . .").

¶101 In sum, our home rule case law instructs us that, when reviewing a legislative enactment under the home rule amendment, we apply a two-step analysis.  First, as a threshold matter, the court determines whether the statute concerns a matter of primarily statewide or primarily local concern.  If the statute concerns a matter of primarily statewide interest, the home rule amendment is not implicated and our analysis ends.  If, however, the statute concerns a matter of primarily local affairs, the reviewing court then examines whether the statute satisfies the uniformity requirement.  If the statute does not, it violates the home rule amendment.

ii.  The Plaintiffs' Local Affairs Argument

¶102 The plaintiffs, against the great weight of our precedent, broadly depict the home rule amendment as prohibiting the State from enacting any legislation that preempts the charter ordinance of a home-rule city when the ordinance concerns a matter of exclusively local affairs.  To support this claim, the plaintiffs rely on this court's holdings in Michalek, 77 Wis. 2d 520, and Thompson v. Kenosha Cnty., 64 Wis. 2d 673, 221 N.W.2d 845 (1974).[30]

---

[30] The plaintiffs also argue that matters of a "purely local concern" are accorded more protection under the home rule amendment than matters categorized as "primarily" local in nature. We are unconvinced. We find nothing in our case law to support this distinction and the plaintiffs failed to provide any additional persuasive authority.

¶103 The plaintiffs interpret <u>Michalek</u> to hold that legislation purporting to preempt a charter ordinance that concerns a matter of local affairs violates the home rule amendment.  In <u>Michalek</u>, this court upheld a City of Milwaukee rent-withholding charter ordinance, concluding the ordinance primarily concerned a matter of local affairs.  <u>Michalek</u>, 77 Wis. 2d at 529, 536.  In discussing the reach of the home rule amendment, the court stated that "[a]s to an area solely or paramountly in the constitutionally protected area of 'local affairs and government,' the state legislature's delegation of authority to legislate is unnecessary and its preemption or ban on local legislative action would be unconstitutional."  <u>Id.</u> at 529.

¶104 Relying on this isolated passage, the plaintiffs construe <u>Michalek</u> to hold that state legislation can never preempt a municipal charter ordinance regulating issues of purely local affairs, regardless of whether the legislation applies uniformly statewide.

¶105 The plaintiffs' reading of <u>Michalek</u> ignores the fact, however, that the court held the charter ordinance and state legislation at issue did not actually conflict with one another.[31]  Therefore, though <u>Michalek</u> determined the charter

---

[31] "They are not locomotives on a collision course.  Rather each moves on its own track, parallel and not too far apart, traveling in the same direction.  With the ordinance on track to further a local affairs concern and the statute on track to advance a matter of statewide concern, we see no constitutional reason to derail either."  <u>State ex rel. Michalek v. LeGrand</u>, 77 Wis. 2d 520, 530, 253 N.W.2d 505 (1977).

ordinance concerned a matter of primarily local affairs, the court did not need to reach the question of whether the contested state legislation satisfied the uniformity requirement of the home rule amendment.  In fact, the court in Michalek clarified this very point:

> With no conflict between ordinance and statute, and no potential for conflict, we do not give consideration to the undiscussed question whether the home rule amendment reference to "enactments of legislative and state-wide concern as shall with uniformity affect every city and every village," (Art. XI, sec. 3, Wis.Const.) includes or does not include a statute applying only to counties with over 100,000 population.

Michalek, 77 Wis. 2d at 530 n.16.  Put differently, Michalek makes plain that if the court had reached a different conclusion and found the legislation and charter ordinance did, in fact, conflict, the court would have proceeded by examining whether the statute applied uniformly statewide.  Read in this context, Michalek does not hold that state legislation that conflicts with a charter ordinance concerning a matter of local affairs is per se unconstitutional.  The plaintiffs' assertion that Michalek supports such a proposition is entirely misplaced. Michalek is in accord with this court's long-held rule that when the charter ordinance of a home rule city concerns a matter of local affairs, conflicting legislation must be uniformly applied statewide to satisfy the home rule amendment.

¶106 The plaintiffs' reliance on Thompson hinges on the following language:  "Sec. 3, art. XI of the constitution places two limitations on the legislature's power to enact statutes

58

interfering with city and village affairs: (1) The subject of the statutes must be a matter of statewide concern; and (2) such statutes must uniformly affect all cities and villages." Thompson, 64 Wis. 2d at 683.  The plaintiffs argue that this explicit statement that two limitations exist——statewide concern and uniformity——demonstrates that the uniformity of legislation, alone, does not satisfy the home rule amendment.

¶107 We acknowledge the language that the plaintiffs highlight in Thompson appears, at first blush, to conflict with this court's prior interpretations of the home rule amendment. However, a close reading reveals that the implied rule in Thompson cited to by the plaintiffs——that, in matters concerning local affairs, the home rule amendment requires state legislation to concern a matter of statewide concern and be uniformly applied statewide——is never employed by the Thompson court and is, in fact, internally inconsistent with the court's own analysis.

¶108 In Thompson, we examined a challenge to a state statute that permitted counties to create a county assessor system.  Id. at 676.  Specifically, the challengers argued that the statute violated the home rule amendment because it impermissibly superseded the assessment powers of cities, villages, and towns within such counties.  Id. at 682-83.  After setting out the language emphasized by the plaintiffs in this case, the Thompson court then considered whether the state law at issue violated the home rule amendment.  First, the court determined that the subject matter of the legislation, which

59

dealt with property tax assessments, was primarily a statewide concern. Id. at 686. Subsequently, in considering the uniformity requirement, the Thompson court noted:

> th[e] uniformity limitation only applies if the subject of the statute concerns primarily local affairs. If the subject of the legislation is of statewide concern, the uniformity restriction is inapplicable. . . . Since we have concluded that the subject of [the state law at issue] was primarily a matter of statewide concern, the uniformity requirement of the home rule amendment is not applicable here. . . . Thus, even if [the state law at issue] concerns local affairs, and must therefore affect cities and villages uniformly, we hold that this uniformity requirement is not violated.

Id. at 686-87 (emphasis added). Thus, Thompson held that, even had the court decided the state law at issue concerned a matter of local affairs rather than a statewide concern, the statute would still be upheld because it "applie[d] with equal force throughout the state." Id. at 688. We find it significant that the reasoning and holding in Thompson read as a whole, unlike the isolated passage relied upon by the plaintiffs, harmonizes with controlling precedent.

¶109 The reasoning and holdings of Thompson and Michalek are consistent with the entire body of our longstanding home rule jurisprudence and we find no conflict in our precedent to

be resolved.[32] Consequently, we perceive no merit in the plaintiffs' broad characterization of the legislative power conferred to municipalities by the home rule amendment. Instead, we reaffirm that, while the home rule amendment authorizes municipal regulation over matters of local concern and protects that regulation against conflicting state law, state law will still preempt that municipal regulation if it "with uniformity . . . affect[s] every city or every village." Wis. Const. art. XI, § 3(1).

---

[32] In fact, the plaintiffs' interpretation of our home rule jurisprudence appears to be as novel as it is mistaken. In surveying the ample scholarship on the topic of state constitutional home rule, we are unable to find a single interpretation of our home rule precedent that aligns with the plaintiffs' argument that no state law may preempt a charter ordinance that concerns a matter of purely local affairs. See, e.g., Kerry A. Burchill, Madison's Minimum-Wage Ordinance, Section 104.001, and the Future of Home Rule in Wisconsin, 2007 Wis. L. Rev. 151, 164-65 ("[Wisconsin's home rule] amendment does provide an exception which permits the legislature to regulate an area of local concern if the enactment uniformly applies to every city or village in the state."); Robert D. Zeinemann, Overlooked Linkages Between Municipal Incorporation and Annexation Laws: An in-Depth Look at Wisconsin's Experience, 39 Urb. Law. 257, 266 n.64 (2007) ("Constitutional home rule in Wisconsin provides only minimal autonomy to cities and villages because, even in matters of primarily local concern, the Wisconsin legislature may enact legislation controlling those issues if the act uniformly applies to every city or village in the state."); see also 1 Chester James Antieau, Mun. Corp. Law. § 3.20 (1995); Douglas A. Yanggen & Leslie L. Amrhein, Groundwater Quality Regulation: Existing Governmental Authority and Recommended Roles, 14 Colum. J. Envtl. L. 1, 18 (1989); Robert W. Hansen, Municipal Home Rule in Wisconsin, 21 Marq. L. Rev. 2, 82 (1937); Eugene McQuillin, 2 McQuillin Mun. Corp. § 4:82 (3d ed.).

¶110 Having reaffirmed our established analytical framework for home rule amendment challenges, we now apply that framework to the legislative enactment at issue, Wis. Stat. § 62.623.

### iii. Statewide or Local Concern

¶111 We first address whether Wis. Stat. § 62.623 concerns a matter of exclusively statewide concern, exclusively local affairs, or a mix of both statewide and local interests. The defendants argue that Wis. Stat. § 62.623 addresses a matter of statewide concern. Specifically, the defendants contend that the legislature, in enacting Act 10, clearly believed that the entire State of Wisconsin——including its municipalities——was in a financial crisis. In order to effectively respond to this crisis, the legislature deemed it essential to lower the costs associated with public employees statewide. Further, the defendants cite to the State's "shared revenue" program and other state aid provided to counties and municipalities to

bolster the argument that local spending is an issue of statewide concern.[33]

¶112 The plaintiffs, on the other hand, argue that Wis. Stat. § 62.623, by prohibiting the City of Milwaukee and participating city agencies from paying the employee share of contributions to the Milwaukee ERS, unconstitutionally infringes on a matter of purely local concern. Both the plaintiffs and the dissent[34] cite to Van Gilder for the proposition that issues tied to a municipality's local spending powers——here, the City of Milwaukee's administration of its own retirement system——is quintessentially a local affair. 222 Wis. at 81-82 (quoting J. Cardozo in Adler v. Deegan, 167 N.E. 705, 713 (1929)) ("There are some affairs intimately connected with the exercise by the city of its corporate functions, which are city affairs

---

[33] State-generated revenues are distributed to local governments pursuant to the State's "shared revenue" program. See, e.g., Wis. Stat. ch. 79. In 2011, the legislature allocated $824,825,715 for distribution to counties and municipalities in fiscal year 2011 and $748,075,715 for distribution "in 2012, and each year thereafter." Wis. Stat. § 79.01(2). The plaintiffs vehemently disagree with the defendants' depiction of the State's shared revenue program, noting that under the program a municipality is unable to increase expenditures in order to receive more funding from the State. The plaintiffs are correct that nothing in the record supports the defendants' implication that the shared revenue program contributes to, or is affected by, the administration of the Milwaukee ERS. Accordingly, the defendants' reference to the shared revenue program merely provides us with an illustration of the uncontested fact that there are intergovernmental transfers between the state and its municipalities.

[34] Dissent, ¶223.

only . . . . Most important of all perhaps is the control of the locality over payments from the local purse").

¶113 This court has long recognized that the terms "local affairs" and "statewide concern" in the home rule amendment are problematically vague. See, e.g., Van Gilder, 222 Wis. at 73 (observing that the phrases "local affairs" and "statewide concern" are "practically indefinable"). Further, the terms "local affairs" and "statewide concern" carry the risk of oversimplifying reality: the "functions of state and local governments necessarily overlap," Van Gilder, 222 Wis. at 64, and, moreover, the nature of governmental functions can change over time.[35] Consequently, home rule challenges are, by necessity, fact-specific inquiries, and determinations are made on an ad hoc basis. See, e.g., California Fed. Sav. & Loan Ass'n. v. City of Los Angeles, 812 P.2d 916, 925 (Cal. 1991) (noting that a "municipal affair" and "statewide concern" represent "legal conclusions rather than factual descriptions").

¶114 Here, the public policy matter at issue unquestionably touches on matters of both statewide and local concern. The administration of a city's retirement system, entirely self-reliant in both its management and funding, certainly concerns a matter of local affairs. As the plaintiffs correctly observe, the regulation of local budgetary policy and

---

[35] See, e.g., Helmer v. Superior Court of Sacramento Cnty., 191 P. 1001, 1001 (Cal. 1920) (noting that "[t]he term 'municipal affairs' is not a fixed quantity, but fluctuates with every change in the conditions upon which it is to operate").

spending have long been considered matters of purely local concern. See, e.g., Van Gilder, 222 Wis. 58. Further, the enactment of Act 10 negatively impacts the City of Milwaukee's sensible interest in offering greater employee benefits in order to attract personnel. In fact, the initial legislative purpose in authorizing the establishment of the Milwaukee ERS was to "strengthen the public service in cities of the first class by establishing the security of such retirement benefits." § 31(1), ch. 441, Laws of 1947.

¶115 Conversely, the statewide regulation of public sector employee expenditures during a period of economic recession unquestionably involves a matter of statewide importance. The terms of the public employer-employee relationship have long been the subject of statewide legislation in Wisconsin. In fact, Wisconsin was the first state in the nation to establish a framework for public employees to engage in collective bargaining.[36] Since that time, the state legislature has enacted numerous statutes dealing with a broad range of issues relating to the public employer-employee relationship. See, e.g., Wis. Stat. § 111.01 (governing standards regarding employment peace); Wis. Stat. § 111.321-325 (prohibiting employment discrimination); Wis. Stat. § 111.70 (governing statewide collective bargaining framework); Wis. Stat. ch. 230

---

[36] See, Todd C. Dvorak, Heeding "The Best of Prophets": Historical Perspective and Potential Reform of Public Sector Collective Bargaining in Indiana, 85 Ind. L.J. 701, 707-08 (2010).

(establishing civil service protections for state employees). Further, statewide legislation aimed at improving the fiscal health of the state budget is indisputably a general state concern.

¶116 Having concluded the conflict between Wis. Stat. § 62.623 and the Milwaukee Charter Ordinance implicates both statewide and local concerns, we apply the "test of paramountcy." As explained supra ¶100, when a challenged legislative enactment impacts both statewide and local interests, we must determine whether the legislation "is primarily or paramountly a matter of 'local affairs and government' under the home rule amendment or of 'state-wide concern' under the exception thereto . . . ." Michalek, 77 Wis. 2d at 528.

¶117 Our home rule jurisprudence instructs this court, in confronting the "heavy burden of developing the lines" between matters of statewide and local concern, to consider whether the conflict between the charter ordinance and the statute at issue more greatly concerns the people of the entire state or the

people in the municipality.[37]  See, e.g., Michalek, 77 Wis. 2d at 527 (noting "that many matters while of 'state-wide concern,' 'affecting the people and state at large somewhat remotely and indirectly, yet at the same time affect the individual municipalities directly and intimately, can consistently be, and are, 'local affairs'. . . .'") (quoting State ex rel. Ekern v. City of Milwaukee, 190 Wis. 633, 640, 290 N.W. 860 (1926)); Brelsford, 41 Wis. 2d at 86-87 (reasoning that a charter ordinance regarding the regulation of pension benefits for Milwaukee police officers who teach upon retirement is of more interest to Milwaukee than the state at large); Fond du Lac, 273 Wis. at 338-39 (explaining that "where a matter affects the interests of local residents as well as the interests of the people in other areas of the state, the test to be applied in resolving the matter is that of paramount interest . . . .").

---

[37] This is a rational approach considering that, in weighing conflicts between state and local regulation, the policy matter at issue in a local ordinance will not always equate to the policy matter at issue in the state legislation.  Though this is unavoidable, it is also decidedly problematic, given that the label affixed to the matter at issue often governs whether there is a constitutional violation.  The considerable significance this analytical approach ascribes to the box a policy matter is placed in exacerbates the risk of a cavalier, mechanistic jurisprudence.  Accordingly, given that the policy matters of conflicting state and local regulations often diverge in scope and purpose, and their categorization is of substantial consequence, we conclude that our established approach of categorizing the policy matters of conflicting regulations by examining whether the concern arising from the conflict is greatest within the municipality or the state to be sensible.

¶118 Under this approach, while we recognize that the impact of Act 10 on both the Milwaukee ERS and the City of Milwaukee is significant and unquestionably touches on a matter of local affairs, we conclude the Act primarily implicates a matter of statewide concern. The State has a substantial interest in maintaining uniform regulations on public pension plans in order to reduce the fiscal strain caused by state and local expenditures for public employee compensation. Further, the State is obligated to maintain a functioning civil service system. Public employees work in areas of fundamental importance, ranging from education and public health, to housing and sanitation. Without question, the State has an interest in seeking to safeguard the vitality of these essential services in times of economic uncertainty and duress.[38]

¶119 We do not suggest that the City of Milwaukee mismanaged its retirement system or that Governor Walker and state legislature enacted a law that has been or will be effective in fulfilling its purported objectives. Such political inquiries are beyond the purview of this court. The legislature has broad latitude to experiment with economic

---

[38] The dissent suggests that our conclusion rests primarily on the fiscal concerns underlying and leading up to the enactment of Act 10. Dissent, ¶219. Wisconsin's considerable financial interest in alleviating a massive budget shortfall is certainly a meaningful factor in our analysis. But, as discussed supra ¶¶115, 118, we also take into account several other factors, including the scope of the legislation, the State's interest in maintaining essential public services, and its historic role in regulating matters affecting the employer-employee relationship.

problems and we do not presume to second-guess its wisdom.  See
Ferguson v. Skrupa, 372 U.S. 726 (1963). Instead, our review is
limited to determining whether the policy matter at issue
between the conflicting state and local regulation is best
described as involving a local affair or a statewide concern.

¶120 Here, the state legislation at issue, Act 10, was
enacted by the legislature during a period of intense fiscal
uncertainty.[39]  The National Association of State Budget Officers
noted that 2010 "presented the most difficult challenge for
states' financial management since the Great Depression. . . . "
Nat'l Governors Ass'n & Nat'l Ass'n of State Budget Officers,
The Fiscal Survey of States vii (June 2010).  At the time Act 10
was enacted, the Department of Administration was predicting

---

[39] The dissent takes issue with our review of the policy
concerns underlying Act 10 as a whole, rather than "the specific
statute at issue, Wis. Stat. § 62.623(1)."  Dissent, ¶¶226, 231.
The dissent's position illustrates the importance of how one
frames the policy matter at issue.  The dissent defines the
issue by looking solely at the local ordinance.  This technique
demonstrates what happens when one adopts a results-driven
approach.  As we explained supra note 37, we conclude the more
sensible approach is to balance the interests of both the state
legislation and the charter ordinance at issue.  The inquiry is
not simply whether there is an interest of local affairs.
Indeed, we acknowledge repeatedly that the interests of the City
of Milwaukee are heavily implicated here.  Rather, we hold the
appropriate inquiry is whether the concern arising from the
conflicting regulation is greatest within the municipality or
the state.

Wisconsin was facing a $3.6 billion dollar budget deficit.[40] Nationwide, analysts projected that states would face close to $300 billion in budget shortfalls between fiscal years 2009 and 2012.

¶121 Enacted during an emergency legislative session, and referred to broadly as the Budget Repair Bill, the scope of Act 10 is extraordinary. It addresses a broad range of subjects, including health insurance premiums, collective bargaining of state employees, retirement contributions for public employees statewide, and modifications to the earned income tax credit.

¶122 It is significant that Act 10 impacts the entire state. Act 10 is not narrow and particularized in its application; rather, it is a broad and comprehensive law that applies, not just to City of Milwaukee employees, but to every general employee in the State of Wisconsin. Governor Walker and the legislature determined that, considering the challenges presented by the grim economic climate, it was imperative to make drastic public policy changes, in several areas of the law, spanning the entire state.

¶123 We find that, given the facts presented in this case, the conflicting state and local regulations are of more paramount concern within the state as a whole than in the City

---

[40] Wisconsin Department of Administration, State of Wisconsin 2011-13 Executive Budget in Brief, http://www.doa.state.wi.us/Documents/DEBF/Budget/Biennial%20Budget/Biennial%20Budget%20Archives/2011-13%20Biennial%20Budget/2011-13_BIB.pdf, (last visited June 19, 2014).

of Milwaukee.  Accordingly, we conclude that Wis. Stat. § 62.623 and related statutes are primarily a matter of statewide concern.

¶124 We note the plaintiffs insist this conclusion cannot be reached without ignoring the deference owed to a statement of intent included in a 1947 legislative amendment pertaining to the Milwaukee ERS.[41]  We find this argument unpersuasive.  The statement of intent referenced by the plaintiffs provides:

> For the purpose of giving to cities of the first class the largest measure of self-government with respect to pension annuity and retirement systems compatible with the constitution and general law, it is hereby declared to be the legislative policy that all future amendments and alterations to this act are matters of local affair and government and shall not be construed as an enactment of state-wide concern.

§ 31(1), ch. 441, Laws of 1947.  The plaintiffs argue that this statement of intent preserved the City of Milwaukee's autonomy in managing the Milwaukee ERS and precluded future state legislative enactments that infringe on that autonomy.

¶125 The plaintiffs overstate their case.  To be sure, this court has held that legislative determinations regarding whether a policy matter constitutes a "statewide concern" or a matter of "local affairs," is entitled great weight when categorizing legislative acts.  See, e.g., Van Gilder, 222 Wis. at 73-74 (noting that "[e]ven though the determination made by [the

---

[41] In 1937, the legislature enacted a law that authorized the City of Milwaukee to create the Milwaukee ERS.  See ch. 396, Laws of 1937.  In 1947, the legislature amended that act and included the statement of intent referenced above.  § 31, ch. 441, Laws of 1947.

71

legislature] should be held not to be absolutely controlling, nevertheless it is entitled to great weight because matters of public policy are primarily for the legislature").

¶126 However, we reject the plaintiffs' contention that the legislature's declaration in 1947 that the Milwaukee ERS is a matter of local concern is an immutable determination.  While the legislature in 1947 may have intended to block future legislatures from regulating public sector pension funds in the City of Milwaukee, it unquestionably lacked that power through direct legislative action, let alone through a general statement of legislative intent.  Wisconsin case law has long held that "[o]ne legislature may not bind a future legislature's flexibility to address changing needs.  Thus, one legislature may not enact a statute which has implications of control over the final deliberations or actions of future legislatures." Flynn v. Dep't of Admin., 216 Wis. 2d 521, 543, 576 N.W.2d 245 (1998) (internal quotation marks omitted).

¶127 Further, the nature of public policy matters is not static,[42] and as a result, the character of governmental functions can change over time.  Plainly, the legislature's

---

[42] See, e.g., Kenneth E. Vanlandingham, Municipal Home Rule in the United States, 10 Wm. & Mary L. Rev. 2, 291 (1968); Robert W. Hansen, Municipal Home Rule in Wisconsin, 21 Marq. L. Rev. 2, 77 (1937) ("What is quite local in character today may not be so tomorrow.  In the 'horse-and-buggy' days of an earlier era it is quite conceivable that maintenance of village streets could be placed in the category of local affairs.  Today when trucks and busses drive from city to city, village to village is it still so?").

determination in 1947 that pension and retirement plans are a local concern does not mean it is an accurate portrayal of how pension and retirement plans impact the fiscal realities of Wisconsin in 2014. See, e.g., 1 Chester James Antieau, Municipal Corporation Law § 3.40, at 3-108 (1995) ("The danger[] to be avoided [is] . . . a temptation to consider something 'state' or 'local' because it was so denominated fifty years ago").[43]

¶128 The ultimate determination whether a legislative enactment is primarily a matter of local or statewide concern rests with this court and not the legislature. Van Gilder, 222 Wis. 58. Thus, while we give deference to the legislature's 1947 proclamation, it is not conclusive in our home rule analysis of Wis. Stat. § 62.623.

¶129 Therefore, for the reasons explained above, we hold that Wis. Stat. § 62.623 concerns a matter of primarily statewide concern. Accordingly, we need not go any further to conclude that Wis. Stat. § 62.623 survives the plaintiffs' home rule challenge.

---

[43] Act 10 did not provide an express legislative declaration that the apportionment of contributions to the Milwaukee ERS is a matter of statewide concern. The defendants argue, however, that Act 10 contained an implicit determination that it was a matter of statewide concern because of the restrictions Wis. Stat. § 62.623 imposed. The plaintiffs counter that no case law supports the notion that implicit legislative determinations are relevant in home rule analysis. Because we decide the parties' statewide concern arguments on other grounds, we do not need to address the issue of whether arguably implicit legislative determinations should be accorded weight.

E. Wisconsin Stat. § 62.623 and the Contract Clause

¶130 Having determined that Wis. Stat. § 62.623 does not violate the home rule amendment, we turn to whether the statute violates the constitutionally protected right of parties to contract with each other.

¶131 As we explained supra ¶87, the Milwaukee ERS[44] requires that plan members contribute, or have contributed on their behalf, 5.5% of their earnable compensation.  Prior to the enactment of Act 10, the City of Milwaukee funded the member contributions of each municipal employee hired prior to January 1, 2010.  Wisconsin Stat. § 62.623, created by Act 10, prohibits the City of Milwaukee from making these contributions to the Milwaukee ERS on the plan member's behalf.

¶132 Chapter 36 of the Milwaukee Charter Ordinance ("Chapter 36") establishes the framework of the Milwaukee ERS. The plaintiffs argue these provisions contractually guarantee that the City of Milwaukee will fund the member contributions to the Milwaukee ERS on behalf of each participating employee hired prior to January 1, 2010, and that, consequently, Wis. Stat. § 62.623 constitutes an unconstitutional impairment of contractual obligations.  The defendants counter that Wis. Stat.

---

[44] The Milwaukee ERS is a defined benefit plan.  Defined benefit plans consist of a general pool of assets, rather than individual dedicated accounts, and provide plan members, upon retirement, a fixed periodic payment.  See, e.g., Comm'r v. Keystone Consol. Indus., Inc., 508 U.S. 152, 154 (1993). Generally, the asset pools of defined benefit plans may be funded by employee contributions, employer contributions, or a combination of both.  Id.

§ 62.623 impairs no contractual rights between the City of Milwaukee and its employees. In the alternative, the State argues that even if an impairment of contractual rights exists, a significant and legitimate public purpose justifies the impairment and the legislation is narrowly tailored to serve that purpose.

### i. General Contract Clause Principles

¶133 The Wisconsin Constitution prohibits the State from impairing its contractual obligations. Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, ¶51, 295 Wis. 2d 1, 719 N.W.2d 408. The Contract Clause of the Wisconsin Constitution provides: "[n]o bill of attainder, ex post facto law, nor any law impairing the obligation of contracts, shall ever be passed. . . . " Wis. Const. art. I, § 12.[45]

¶134 In evaluating a claim brought under the Contract Clause, we first consider whether the contested state legislation has "operated as a substantial impairment of a contractual relationship." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244 (1978). This inquiry has three components: (1) whether there is a contractual relationship, (2)

---

[45] Similarly, the Contract Clause of the United States Constitution provides, in relevant part: "No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts . . . ." U.S. Const. art. I, § 10, cl. 1. Although our interpretation of the Contract Clause of the Wisconsin Constitution need not parallel federal interpretations of the Contract Clause of the United States Constitution, our prior decisions have relied upon the decisions of the United States Supreme Court for guidance. Chappy v. LIRC, 136 Wis. 2d 172, 186, 401 N.W.2d 568 (1987).

whether a change in law impairs that contractual relationship, and (3) whether the impairment is substantial.  Dairyland, 295 Wis. 2d 1, ¶261 (Prosser, J., concurring in part/dissenting in part).

¶135 The inquiry does not end when the reviewing court finds a contractual relationship exists and that the change in law constitutes a substantial impairment of that contractual relationship.  If the legislative act constitutes a substantial impairment to a contractual relationship, it will still be upheld if a significant and legitimate public purpose for the legislation exists.  Id., ¶56.  "Although the public purpose need no longer address an emergency or temporary situation, it should be directed towards remedying a broad and general social or economic problem" as opposed to benefiting a narrow special interest.  Chappy v. LIRC, 136 Wis. 2d 172, 188, 401 N.W.2d 568 (1987); see also Energy Reserves Grp., Inc. v. Kansas Power & Light Co., 459 U.S. 400, 412 (1983).

¶136 Finally, if a significant and legitimate purpose exists for the challenged legislation, "the question becomes whether the legislature's impairment of the contract is reasonable and necessary to serve an important public purpose." Wis. Prof'l Police Ass'n v. Lightbourn, 2001 WI 59, ¶149, 243 Wis. 2d 512, 627 N.W.2d 807.

¶137 As the court of appeals explained in its certification, under the established framework for Contract Clause analysis, the plaintiffs' challenge presents two issues: (1) whether Chapter 36 of the Milwaukee Charter Ordinance

76

contains a contractual guarantee that the City of Milwaukee will fund the member contributions on behalf of each participating employee hired prior to January 1, 2010, and (2) if a contractual right exists, whether there has been an impermissible impairment of the contract.[46]

ii. Contractual Rights Under Milwaukee ERS

¶138 A legislative enactment is presumed not to create "contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co., 470 U.S. 451, 466 (1985) (internal quotation marks omitted); see also U.S. Trust Co. v. New Jersey, 431 U.S. 1, 17 n.14 (1977) (a statute is "treated as a contract when the language and circumstances evince a legislative intent to create private

---

[46] The defendants raise a separate argument that municipalities are not empowered to enter into contracts that are not subject to subsequent amendments by the legislature. The defendants misconstrue our case law by inaccurately framing the point of law they are actually contesting. The question presented is whether a municipality is empowered to enter into contracts with third parties that create a vested contractual relationship that is protected by the constitution. Our case law is clear on this point. Municipalities may "lawfully enter[] into contracts with third persons which . . . will be protected by the constitution . . . ." Douglas Cnty. v. Indus. Comm'n, 275 Wis. 309, 315, 81 N.W.2d 807 (1957) (quoting Town of Holland v. Village of Cedar Grove, 230 Wis. 177, 189, 282 N.W. 111 (1938); see also Superior Water, Light & Power Co. v. City of Superior, 263 U.S. 125, 135-37 (1923) (in interpreting Wisconsin law, holding that municipalities may enter into contracts where rights are acquired or liabilities incurred and the state legislation impairing those rights is unconstitutional); State ex rel. O'Neil v. Blied, 188 Wis. 442, 447, 206 N.W. 213 (1925). The defendants' assertion to the contrary is unfounded.

77

rights of a contractual nature enforceable against the State"). Thus, courts employ a "very strong" presumption that "legislative enactments do not create contractual rights." Dunn v. Milwaukee Cnty., 2005 WI App 27, ¶8, 279 Wis. 2d 370, 693 N.W.2d 82.

¶139 The threshold requirement to recognize public contracts has been referred to as the "unmistakability doctrine." Parker v. Wakelin, 123 F.3d 1, 5 (1st Cir. 1997). The unmistakability doctrine is a canon of construction rooted in the belief that "legislatures should not bind future legislatures from employing their sovereign powers in the absence of the clearest of intent to create vested rights protected under the Contract Clause . . . ." Id. ("'[N]either the right of taxation, nor any other power of sovereignty, will be held . . . to have been surrendered, unless such surrender has been expressed in terms too plain to be mistaken.'" Id. (quoting United States v. Winstar Corp., 518 U.S. 839, 874-75 (1996)). "The requirement that 'the government's obligation unmistakably appear thus served the dual purposes of limiting contractual incursions on a State's sovereign powers and of avoiding difficult constitutional questions about the extent of State authority to limit the subsequent exercise of legislative power.'" Id. (quoting Winstar, 518 U.S. at 875).

¶140 Hence, in this case, we must consider whether Chapter 36 of the Milwaukee Charter Ordinance evinces a clear intent by

the City of Milwaukee Common Council ("Common Council")[47] to create contractual rights against the modification of contribution payments to the Milwaukee ERS.

¶141 Wisconsin precedent has held that public pension plans may create constitutionally protected contractual rights between the State and public employees that are protected by the Wisconsin Constitution. See State ex rel. Cannon v. Moran, 111 Wis. 2d 544, 554, 331 N.W.2d 369 (1983) (holding that the plaintiffs, as plan members of the Milwaukee County Employees' Retirement System, had a constitutionally protected contract).

¶142 As this court has noted, however, when examining whether a legislative enactment creates a contractual relationship, it is imperative to determine whether the legislature intended to "create private contractual or vested rights" or "merely to declare[] a policy to be pursued . . . ." Morrison v. Bd. of Educ. of City of West Allis, 237 Wis. 483, 487, 297 N.W. 383 (1941). For a legislative enactment to be considered a contract, "the language and circumstances [must] evince a legislative intent to create private rights of a contractual nature enforceable against the State." Lightbourn, 243 Wis. 2d 512, ¶145 n.188 (quoting U.S. Trust, 431 U.S. at 17 n.14). This requires us, when reviewing a particular

---

[47] The Common Council exercises all policymaking and legislative powers for the City of Milwaukee, including the adoption of ordinances and resolutions and the approval of the city's annual budget. See City of Milwaukee, Common Council Members, http://city.milwaukee.gov/CommonCouncil/Council-Member-Web-Pages.htm#.U8xI3M0_1kg (last visited July 20, 2014).

legislative enactment, to suspend judgment and "'proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation.'" Parker, 123 F.3d at 7-8 (quoting Atchison, 470 U.S. at 466).

¶143 We begin with the language of Chapter 36 of the Milwaukee Charter Ordinance.[48] The parties' arguments rely on the following ordinance subsections from Chapter 36:

> § 36-08-7-a-1: [T]he city shall contribute on behalf of general city employes 5.5% of such member's earnable compensation.
>
> § 36-13-2-a: Every such member . . . shall thereby have a benefit contract in . . . . all . . . benefits in the amounts and upon the terms and conditions and in all other respects as provided under this [ordinance] . . . and each member and beneficiary having such a benefit contract shall have a vested right to such . . . benefits and they shall not be diminished or impaired by subsequent legislation or by any other means without his consent.
>
> § 36-13-2-c: Every person who shall become a member of this retirement system . . . shall have a similar benefit contract and vested right in . . . all . . . benefits in the amounts and on the terms and conditions and in all other respects as . . . in

---

[48] "The rules for the construction of statutes and municipal ordinances are the same." Cnty. of Columbia v. Bylewski, 94 Wis. 2d 153, 169 n.7, 288 N.W.2d 129 (1980). Therefore, if the "plain meaning of the [ordinance] is clear, a court . . . should simply apply the clear meaning of the [ordinance] to the facts before it." Bruno v. Milwaukee Cnty., 2003 WI 28, ¶7, 260 Wis. 2d 633, 660 N.W.2d 656 (quoting UFE Inc. v. LIRC, 201 Wis. 2d 274, 281-82, 548 N.W.2d 57 (1996)).

effect at the date of the commencement of his membership.

§ 36-13-2-d: Contributions which are made to this fund . . . by the city . . . as contributions for members of this system shall not in any manner whatsoever affect, alter or impair any member's rights, benefits, or allowances, to which such member under this [ordinance] is or may be entitled. . . .

§ 36-13-2-g: Every member, retired member, survivor and beneficiary who participates in the combined fund shall have a vested and contractual right to the benefits in the amount and on the terms and conditions as provided in the law on the date the combined fund is created.

¶144 Turning to the language of Chapter 36, we find it unquestionably creates contractual rights in the pension benefits of Milwaukee ERS plan members.[49] Two subsections of Chapter 36 are particularly germane in reaching this conclusion. First, § 36-13-2-g provides:

Every member, retired member, survivor and beneficiary who participates in the combined fund shall have a vested and contractual right to the benefits in the amount and on the terms and conditions as provided in the law on the date the combined fund is created.

(Emphasis added.)  Further, § 36-13-2-a provides, in relevant part:

Every such member . . . shall thereby have a benefit contract in . . . all . . . benefits in the amounts and upon the terms and conditions and in all other respects as provided under this [ordinance] . . . and each member and beneficiary having such a benefit contract shall have a vested right to such . . . benefits and they shall not be diminished or impaired

_____

[49] The question of when or to what extent pension benefits vest for plan members under the Milwaukee ERS is not before us and, accordingly, we do not address the issue.

81

by subsequent legislation or by any other means without his consent.

(Emphasis added.)

¶145 Sections 36-13-2-g and 36-13-2-a unmistakably evince the clear intention of the Common Council to create a "vested and contractual right to the [pension] benefits in the amount and on the terms and conditions" as provided in Chapter 36. § 36-13-2-g.

¶146 However, this still leaves unresolved the central issue before us: whether "contributions" to the Milwaukee ERS fit within the "benefits" for which plan members have a "vested and contractual right." § 36-13-2-g.

¶147 The defendants contend that § 36-13-2-g, which the plaintiffs cite as creating a "contractual right" to the contributions paid by the City of Milwaukee, can create no such contractual obligation because the subsection does not refer explicitly to "contributions."[50] Further, the defendants argue § 36-13-2-d demonstrates that, as the terms are used in Chapter 36, contributions to the Milwaukee ERS are not "benefits" or "terms and conditions."

¶148 The plaintiffs disagree with the defendants' reading of Chapter 36 and note that the title of § 36-13-2 is "Contracts to Assure Benefits," and that the subsection guarantees that

---

[50] The defendants also reference a different ordinance subsection (§ 16-32-2-c) with nearly identical language as § 32-13-2-g in its briefing, but as the court of appeals observes in its certification, neither party suggests an independent analysis of the other subsection would affect the outcome in this case.

every member shall have a benefit contract and vested right concerning "[t]he annuities and all other benefits in the amounts and upon the terms and conditions and in all other respects as provided under this act [which] shall not be diminished or impaired by any subsequent legislation or by any other means." § 36-13-2-a. The plaintiffs contend that the words "upon the terms and conditions and in all other respects as provided under this act," incorporate § 36-08-7a-1, which provides that the City of Milwaukee will contribute 5.5% of its employees' earnable compensation to the Milwaukee ERS.

¶149 The parties agree that Chapter 36 unambiguously requires plan members of the Milwaukee ERS to "contribute or have contributed on their behalf, 5.5% of the member's earnable compensation." § 36-08-7a-1. Since 1970, and until the enactment of Act 10, the City of Milwaukee, pursuant to § 36-08-7-a-1, has paid the employees' contribution share:

> Members who are not firemen, policemen or elected officials shall contribute or have contributed on their behalf, 5.5% of the member's earnable compensation. Except as provided in subds. 2 and 3, subsequent to and commencing with the first pay period of 1970, the city shall contribute on behalf of general city employes 5.5% of such member's earnable compensation. Members employed by city agencies participating in the system shall contribute 5.5% of their earnable compensation less any contribution made on their behalf as determined by the governing bodies of such agencies.

The plaintiffs argue that the contributions referred to in this subsection are a "benefit," and accordingly, pursuant to § 36-13-2-g and § 36-13-2-a, plan members have a contractually vested

right in the contributions paid by the City of Milwaukee on behalf of all participating plan members.

¶150 Upon a close reading of the language of Chapter 36, however, we find nothing to suggest that the City of Milwaukee intended to classify contribution rates as a contractually protected "benefit."  Consequently, there is no indication the Common Council, and by extension the State, bound itself to never modifying the contribution rates that fund the Milwaukee ERS.

¶151 Two sources in particular inform our analysis.  In § 36-13-2-d, an evident distinction is drawn between "contributions" used to fund the Milwaukee ERS and the "benefits" conferred to plan members.  Section 36-13-2-d provides, in part:

> Contributions which are made to [the Milwaukee ERS] . . . by the city . . . as contributions for members of this system shall not in any manner whatsoever affect, alter or impair any member's <u>rights</u>, <u>benefits</u>, or <u>allowances</u>, to which such member under this [ordinance] is or may be entitled . . . .

(Emphasis added).  This subsection unquestionably distinguishes between the "contributions" paid by the City of Milwaukee and the contractually protected "benefits" of the plan members.  Our rules of interpretation dictate that Chapter 36 must "be construed in a manner that no word is rendered surplusage and every word is given effect."  <u>Cnty. of Adams v. Romeo</u>, 191 Wis. 2d 379, 387, 528 N.W.2d 418 (1995).  Under § 36-13-2-d, it is impossible for contributions to be construed as a benefit. The plaintiffs' argument is premised on the notion that the

84

contributions paid by the City of Milwaukee impact the benefits of plan members. Section 36-13-2-d unequivocally refutes that contention.

¶152 Section 36-05 further belies the plaintiffs' argument that "contributions" are a "benefit" under Chapter 36. Section 36-05, titled "Benefits," defines the pension, disability, and death benefits offered under the Milwaukee ERS.[51] This section outlines in detail the scope of the word "benefits" as it is used in the Charter, listing every benefit of the plan and the terms and conditions related to those benefits. The City of

---

[51] Section 36-05 addresses a wide range of benefits and allowances. As an illustration of the breadth of § 36-05, the benefits and allowances covered in this section include: service retirement (§ 36-05-1), ordinary disability retirement (§ 36-05-2), duty disability retirement (§ 36-05-3), accidental death benefits (§ 36-05-5), separation benefits (§ 36-05-6), optional benefits (§ 36-05-7), survivorship benefits (§ 36-05-8), ordinary death benefits (§ 36-05-10), and a lump sum bonus provision (§ 36-05-11). Each of these enumerated benefits and allowances contains specific information as to the nature of the benefit, the eligibility requirements, how the benefit is calculated, whether the benefit may be transferred or assigned and to whom it may be transferred or assigned, how the benefit is affected by cost of living adjustments, and numerous other terms and conditions.

Milwaukee's self-imposed obligation to pay the employee share of contributions is conspicuously absent from this section.[52]

¶153 In sum, no unmistakable indicia exists in Chapter 36 that contributions paid by the city are a defined "benefit" that is forever impervious to alteration.

¶154 As a defined benefit plan, the Milwaukee ERS calculates benefits based on years of service multiplied by a fixed percentage of base salary. See Milwaukee, Wis. Charter Ordinance ch. 36. The plaintiffs argue that Wis. Stat. § 62.623, by requiring plan members to contribute 5.5% of their earnable compensation, diminishes the value of the benefit without providing a commensurate gain. So, the plaintiffs contend, the defendants' position that contributions are not a "term and condition" effectively excludes the cost of the plan to the employee as a "term and condition" under Chapter 36, which is an absurd result.

---

[52] The dissent takes issue with our interpretation of the term "benefit" under the Milwaukee Charter Ordinance. Specifically, the dissent points to three subsections of § 36-05 that incorporate § 36-08-7 and argues that, based on these statutory cross-references and how "fringe benefits" have been described in select judicial opinions, "contributions" must be a contractually-vested "benefit" under the Milwaukee ERS. The dissent's argument is confused by the reach of our holding and fails to point to any flaw in our analysis. This case does not require us to address whether accumulated contributions are contractually-vested "benefits" under the Milwaukee Charter Ordinance. Instead, our review is limited to determining whether the term "contributions"——that is, the requirement to contribute a certain percentage of earnable compensation into the Milwaukee ERS——constitute a "benefit" under the Ordinance Charter.

¶155 The plaintiffs' argument conflates the accrued benefits of plan members, which Wis. Stat. § 62.623 does not affect, and the funding provisions of Chapter 36, which are not considered a "benefit" under the Charter. Nothing in Act 10 purports to reduce, impair, or affect in any way benefits that have already accrued to plan members. Wisconsin Stat. § 62.623 modifies only the method by which the Milwaukee ERS is funded; the pension, disability, and death benefits that accrue to plan members, pursuant to the terms and conditions in § 36-05, remain unaffected.

¶156 The plaintiffs' contention that Wis. Stat. § 62.623 diminishes accrued "benefits" because it is more costly for plan members misses the point. It is certainly true that the Milwaukee ERS calculates the benefits for a plan member based on years of service multiplied by a fixed percentage of their base salary. To be clear, however, Wis. Stat. § 62.623 does not modify this benefit. It does not modify the base salary of the plan member, the amount of benefits received under the plan, or the plan's overall cost. Rather, Wis. Stat. § 62.623 changes only the allocation of those costs——that is, the contribution requirements shared by the City of Milwaukee and the plan member. We are not overlooking——nor are we unsympathetic to—— the fact that Wis. Stat. § 62.623 increases the cost of participating in the Milwaukee ERS for general employees. This increased cost, however, does not constitute a Contract Clause violation. The plaintiffs may have to contribute more to receive the same benefit, but "the fact that a state makes a

contract more costly to one of the parties does not establish a [Contract Clause] violation." Chrysler Corp. v. Kolosso Auto Sales, Inc., 148 F.3d 892, 894 (7th Cir. 1998).

¶157 Our decision is dictated by the plain language in the Milwaukee Charter Ordinance. Nothing in the Charter evidences that the legislature unmistakably intended to create binding contract rights in the contribution rates established in § 36-08-7-a-1. Further, even if it were unclear whether the legislature intended "contributions" to be a contractually vested "benefit," the very strong presumption employed against state laws creating contractual rights would still defeat the plaintiffs' claim.

¶158 We need not reach the question of impairment or substantiality because the plaintiffs have failed to demonstrate that the allocation of contribution rates in the Milwaukee ERS is a contractual "benefit" protected by the Contract Clause. We conclude that the City of Milwaukee was not contractually obligated to pay the employee share of contributions into the Milwaukee ERS. Therefore, we hold that the plaintiffs failed to establish beyond a reasonable doubt that Wis. Stat. § 62.623 violates the Contract Clause of the Wisconsin Constitution.

## IV. CONCLUSION

¶159 We hold the following:

¶160 First, we hold that the plaintiffs' associational rights argument is without merit. We reject the plaintiffs' argument that several provisions of Act 10, which delineate the rights, obligations, and procedures of collective bargaining,

88

somehow infringe upon general employees' constitutional right to freedom of association.  No matter the limitations or "burdens" a legislative enactment places on the collective bargaining process, collective bargaining remains a creation of legislative grace and not constitutional obligation.  The First Amendment cannot be used as a vehicle to expand the parameters of a benefit that it does not itself protect.  Accordingly, we conclude that Wis. Stat. §§ 111.70(4)(mb), 66.0506, 118.245, 111.70(1)(f), 111.70(3g), 111.70(4)(d)3 and the third sentence of § 111.70(2) do not violate the plaintiffs' associational rights.

¶161 Second, we reject the plaintiffs' equal protection claim under a rational basis standard of review.  We apply rational basis review to the plaintiffs' argument that the collective bargaining framework established by Act 10 violates the constitutional rights of general employees through disparate treatment of those who choose to collectively bargain and those who do not.  Finding the plaintiffs' argument to be unconvincing, we hold Act 10 survives the plaintiffs' equal protection challenge under rational basis review.

¶162 Third, we hold the plaintiffs' home rule amendment argument fails because Wis. Stat. § 62.623 primarily concerns a matter of statewide concern.  Accordingly, we hold that Wis. Stat. § 62.623 does not violate the home rule amendment.

¶163 Finally, we hold that the plaintiffs' Contract Clause claim fails.  The City of Milwaukee was not contractually obligated to pay the employee share of contributions to the

Milwaukee ERS. Further, even if the contributions paid by the City were a contractual right, we hold the contract was not substantially impaired by Wis. Stat. § 62.623. Therefore, we hold that the plaintiffs failed to establish beyond a reasonable doubt that Wis. Stat. § 62.623 violates the Contract Clause of the Wisconsin Constitution.

¶164 Therefore, we uphold Act 10 in its entirety.

*By the Court.*—The decision and order of the circuit court is reversed.

¶165 N. PATRICK CROOKS, J. *(concurring)*. As a justice of the Supreme Court of Wisconsin, I join the majority of this Court in voting to uphold the constitutionality of Act 10. In answering the legal questions put to us as we must, we affirm a legislative act that appears to have gone further than needed. For many public workers, Act 10 effectively ended meaningful union representation carried out through statutory collective bargaining. This type of statutory collective bargaining has long been part of Wisconsin's progressive heritage.

¶166 It is my firm belief that individuals should have the right to organize and bargain collectively regarding their wages and the terms of their employment. As thoughtful people from across the political spectrum and around the world have long recognized, collective bargaining benefits workers, employers and society itself. Although Act 10 does not violate either the United States Constitution or the Wisconsin Constitution, it erodes longstanding benefits both to public workers and to public employers. I write separately to make clear what my vote in this case means and to emphasize the importance of policies that give rights to workers to organize and bargain collectively.

I.   THE LEGAL FRAMEWORK

¶167 The legal questions in this case can be answered in no other way than the majority answers them. Because the affected workers retain "a right to associate for the purpose of engaging

1

in those activities protected by the First Amendment,"[1] Act 10 violates neither their constitutional right of association nor their right to equal protection.[2]   The collective bargaining rights at issue here are statutory, not constitutional rights.

¶168 As I stated in <u>League of Women Voters v. Walker</u>, another case in which plaintiffs made a purely facial challenge to the constitutionality of a statute, the limited question presented and the legal framework prescribed for answering it demand significant restraint on the part of this court:

> With this type of facial challenge, the odds are against the plaintiffs at every turn.  A court is bound to recognize the presumption that the statute is constitutional.  Here, the plaintiffs must prove otherwise beyond a reasonable doubt.  In considering such a challenge, a court must resolve any doubt about the constitutionality of a statute in favor of upholding the statute.
>
> In short, the question before us in this case is not whether the [challenged statute] is good policy, not whether it accomplishes what it sets out to do, and not whether it is unfair under some circumstances to some individuals.  The question before us in this case is solely this: starting with a presumption of constitutionality in its favor, are we persuaded beyond a reasonable doubt that the statute violates the Wisconsin Constitution in every circumstance?  . . .

---

[1] <u>Roberts v. United States Jaycees</u>, 468 U.S. 609, 618 (1984).

[2] Majority op., ¶75 (recognizing that the equal protection argument hinges on the merit of the associational rights claim); <u>see also</u> majority op., ¶24 ("Whether the plaintiffs' First Amendment challenge to these provisions has any merit is the lynchpin of this appeal.").

2

> The question here is not whether the [statute] is good policy, but whether the plaintiffs have proved beyond a reasonable doubt that the [statute] violates the Wisconsin Constitution on any of the grounds claimed by these plaintiffs. Given the framework within which the question must be answered, I agree with the holding of the majority that the plaintiffs have not shown beyond a reasonable doubt that the statute is unconstitutional, and I join that holding and the mandate. I can reach no other conclusion than to uphold [the statute] based on the purely facial challenge here. I therefore respectfully concur.

<u>League of Women Voters v. Walker</u>, 2014 WI 97, ¶¶62-63, 68, ___ Wis. 2d ___, ___ N.W.2d ___ (Crooks, J., concurring) (internal citations and quotations omitted).

¶169 As was true in that case, the analysis required here is straightforward. Under the proper application of the correct legal standard and the relevant precedent, this is not a close call. Therefore the plaintiffs' challenge must fail.

## II. HISTORICAL RECOGNITION OF COLLECTIVE BARGAINING AND ITS VALUE TO SOCIETY

¶170 The value and necessity of collective bargaining and the fair treatment of workers have been recognized by many thoughtful people. As we considered this case, I recalled the eloquence of Rerum Novarum, the 1891 encyclical of Pope Leo XIII that seriously discussed the questions of resolving conflicts between employers and employees fairly and justly. Though more than 120 years have passed since his writing, the encyclical retains a remarkable relevance with its thoughtful comments about workers, employers, unions and "free agreements" reached about wages, hours and conditions of employment.

3

¶171 This lengthy document acknowledges the delicate task it undertakes, takes care to avoid extremist language and specifically rejects socialism as a solution to legitimate concerns of unjust working conditions. Instead, it adopts a respectful tone, recognizing the necessity of free enterprise to society, the value of work and the contributions of workers to their societies:

> Now, for the provision of such commodities, the labor of the working class——the exercise of their skill, and the employment of their strength, in the cultivation of the land, and in the workshops of trade——is especially responsible and quite indispensable. . . . Justice, therefore, demands that the interests of the working classes should be carefully watched over by the administration, so that they who contribute so largely to the advantage of the community may themselves share in the benefits which they create . . . . It follows that whatever shall appear to prove conducive to the well-being of those who work should obtain favorable consideration.[3]

¶172 From such philosophical foundations, the writing turns to practical considerations:

> Let the working man and the employer make free agreements, and in particular let them agree freely as to the wages . . . . In these and similar questions however——such as, for example, the hours of labor in different trades, the sanitary precautions to be observed in factories and workshops, etc.——in order to supersede undue interference on the part of the State, especially as circumstances, times, and localities differ so widely, it is advisable that recourse be had

---

[3] Leo XIII, <u>Rerum Novarum: Encyclical of Pope Leo XIII on Capital and Labor</u> (1891), in Leo XIII, Rerum Novarum, at ¶34 (Catholic Truth Soc'y 2002), <u>available</u> <u>at</u> http://www.vatican.va/holy_father/leo_xiii/encyclicals/documents/hf_l-xiii_enc_15051891_rerum-novarum_en.html.

4

to societies or boards such as We shall mention presently, or to some other mode of safeguarding the interests of the wage-earners; the State being appealed to, should circumstances require, for its sanction and protection. . . .

The most important of all [such associations designed to aid workers] are workingmen's unions, for these virtually include all the rest. History attests what excellent results were brought about by the artificers' guilds of olden times. . . . Such unions should be suited to the requirements of this our age——an age of wider education, of different habits, and of far more numerous requirements in daily life. . . .

[T]o enter into a "society" of this kind is the natural right of man; and the State has for its office to protect natural rights, not to destroy them; and, if it forbids its citizens to form associations, it contradicts the very principle of its own existence, for both they and it exist in virtue of the like principle, namely, the natural tendency of man to dwell in society.[4]

¶173 After setting out this template for mutually respectful relationships between employer and worker, and explicitly endorsing the value of protective organizations such as "workingmen's unions," Pope Leo XIII goes on to state, "[E]very precaution should be taken not to violate the rights of individuals and not to impose unreasonable regulations under pretense of public benefit."[5]

¶174 The encyclical concludes,

We may lay it down as a general and lasting law that working men's associations should be so organized and governed as to furnish the best and most suitable means for attaining what is aimed at, that is to say,

---

[4] <u>Id.</u> at ¶¶45, 49 and 51.

[5] <u>Id.</u> at ¶52.

for helping each individual member to better his condition to the utmost in body, soul and property.[6]

¶175 This recognition of the critical importance of a worker's right to collective bargaining was also central to the political philosophy of one of the most influential public figures in Wisconsin history, United States Senator Robert M. La Follette. Identifying the forces arrayed against the working person in the early twentieth century, La Follette stated at the outset of the 1912 presidential primaries, in which he was a candidate, "I demand protection of wage-earners and farmers in their right to organize and to defend themselves by means of unions. All other issues are subordinate to this great issue."[7]

¶176 Interestingly, Ronald Reagan, a United States President some would consider to be from the other end of the political spectrum, expressed similar convictions. In 1980, the year he was elected, Reagan gave an impassioned Labor Day speech in which he pledged that "American workers will once again be heeded" and promised to "consult with representatives of organized labor on those matters concerning the welfare of the working people of this nation."[8]

---

[6] Id. at ¶57.

[7] Robert M. La Follette, The Republican Party Faces a Crisis (1912), reprinted in The Political Philosophy of Robert M. La Follette As Revealed in His Speeches and Writings 408 (Ellen Torelle, ed., 1920).

[8] Ronald Reagan, Labor Day Speech at Liberty State Park, Jersey City, New Jersey (Sept. 1, 1980), available at www.reagan.utexas.edu/archives/reference/9.1.80.html (last visited May 29, 2014).

¶177 He noted his own union affiliation and experiences:

I happen to be the only president of a union ever to be a candidate for President of the United States. As president of my union——the Screen Actors Guild——I spent many hours with the late George Meany,[9] whose love of country and whose belief in a strong defense against all totalitarians is one of labor's greatest legacies. One year ago today on Labor Day George Meany told the American people:

> As American workers and their families return from their summer vacations they face growing unemployment and inflation, a climate of economic anxiety and uncertainty.

Well I pledge to you in his memory that the voice of the American worker will once again be heeded in Washington and that the climate of fear that he spoke of will no longer threaten workers and their families.[10]

¶178 Reagan went on to focus on the role of unions in bringing about a dramatic transformation of communist Poland:

> These are the values inspiring those brave workers in Poland. The values that have inspired other dissidents under Communist domination. They remind us that where free unions and collective bargaining are forbidden, freedom is lost. . . . Today the workers in Poland are showing a new generation not how high is the price of freedom but how much it is worth that price.[11]

---

[9] George Meany was president of the AFL-CIO from 1955 to 1979. See Owen Ullman, George Meany, Labor's "Giant" Is Dead at 85, Nashua Telegraph, January 11, 1980, at 6.

[10] Ronald Reagan, Labor Day Speech at Liberty State Park, Jersey City, New Jersey (Sept. 1, 1980), available at www.reagan.utexas.edu/archives/reference/9.1.80.html (last visited May 29, 2014).

[11] Id.

III. CONCLUSION

¶179 It is my view that the Wisconsin Legislature and Governor could have chosen a different way to accomplish a goal of cost savings that would have left intact meaningful union representation carried out through statutory collective bargaining for public employees.  It is also my view that the damage to public employee unions due to Act 10 was unnecessary.  It is a departure from Wisconsin's strong tradition.

¶180 Act 10 embodies policy determinations, and such questions are not properly addressed to the members of the Supreme Court of Wisconsin.  Such policy questions are for the Wisconsin Legislature and Governor, and their judgment on such policy matters is for the people of Wisconsin to evaluate.  I respect the boundaries the judicial branch must observe and recognize that we cannot substitute our judgment on questions of policy for that of the Wisconsin Legislature and Governor.[12]  Accordingly, I respectfully concur.

---

[12] "Our duty . . . requires that we uphold the separation of powers by not substituting judicial policy views for the views of the legislature or rule making authority." State ex rel. Griffin v. Smith, 2004 WI 36, ¶19, 270 Wis. 2d 235, 677 N.W.2d 259.

¶181 ANN WALSH BRADLEY, J. *(dissenting).* In reflecting on the importance of an independent judiciary as a separate branch of government, former United States Supreme Court Chief Justice William Rehnquist called the authority to declare unconstitutional a law passed by legislature "probably the most significant single contribution the United States has made to the art of government."

> I believe that the creation of an independent constitutional court, with the authority to declare unconstitutional laws passed by the state or federal legislatures, is probably the most significant single contribution the United States has made to the art of government.[1]

¶182 He emphasized the important role that courts serve in protecting the rights guaranteed under the Constitution. Courts serve as guardians of the constitutional rights of all people. Our challenge as a court is to duly respect the prerogatives of the legislature as reflected in its legislative acts, while at the same time honoring our significant role. We must constantly guard against proper judicial restraint being transformed into improper judicial acquiescence.

¶183 In this case we are presented with constitutional challenges to Act 10. The majority aptly sets forth its

---

[1] Chief Justice William Rehnquist, Remarks at the Symposium on Judicial Independence, University of Richmond T. C. Williams School of Law (Mar. 21, 2003) (on file with the Public Information Office, U.S. Supreme Court), available at www.supremecourt.gov/publicinfo/speeches/viewspeeches.aspx?Filename=sp_03-21-03.html.

1

results. However, it is difficult to find in the majority's lengthy opinion a discussion of the actual arguments and issues presented by the parties.

¶184 An actual issue presented by Madison Teachers is: Does Act 10 infringe on the associational rights of public employees to organize?[2]

¶185 Yet the majority reframes the issue to determine whether there is a constitutional right to collective bargaining and whether the State has an obligation to promote First Amendment rights.

¶186 An actual issue presented by the parties is: Does the provision in Act 10 prohibiting Milwaukee from making contributions to its employees' pension plans violate the Home Rule Amendment?

¶187 Rather than focusing on the provision at issue, the majority shifts the focus to the purpose behind Act 10 as a whole. It determines that because Act 10 deals generally with financial matters, the prohibition on Milwaukee's pension contributions is a matter of statewide concern.

¶188 An actual issue presented by the parties is: Does the prohibition on pension contributions violate the Contract Clause given that benefits are guaranteed by the Milwaukee Charter Ordinance?

---

[2] For purposes of this dissent I use "Madison Teachers" to refer to the plaintiffs collectively.

¶189 By twisting the definition of benefits to exclude pension contributions, the majority thereby avoids any substantive analysis of the Contract Clause.

¶190 The result of the majority's dodge is the needless diminution of multiple constitutional rights:

- The right of freedom of association to organize is diluted as the majority has opened the door for the State to withhold benefits and punish individuals based on their membership in disfavored groups.

- Municipalities' right to self-govern as granted by the Home Rule Amendment rings hollow as the majority determines that when the State has budgetary difficulties, matters dealing with local finances are now matters of statewide concern, even absent any showing of an impact on the State budget.

- And the right to contract is undermined as the majority demonstrates its willingness to creatively interpret a contract in a manner permitting the State to disregard it.

¶191 I determine that the majority's failure to address the actual issues presented allows it to substitute analyses resulting in conclusions that countenance the violation rather than the protection of constitutional rights. Because I

determine that Act 10 unconstitutionally infringes on protected rights, I respectfully dissent.

¶192 There are three main issues raised by the parties: (I) the Right To Associate; (II) the Home Rule Amendment; and (III) the Contract Clause. I address each in turn.

### I. The Right To Associate

¶193 Madison Teachers asserts that Act 10 violates the First Amendment right of freedom of association by infringing on its right to organize.[3] Given that the State has conceded that the challenged provisions in Act 10 cannot survive such a constitutional challenge if a strict scrutiny review is applied, the majority has to avoid strict scrutiny to arrive at its result.[4] How does it do that? It jettisons the focus of its analysis.

¶194 Rather than addressing plaintiff's issue that Act 10 infringes on its constitutional right to _organize_ into a collective bargaining unit, the majority erroneously asserts

---

[3] The First Amendment of the United States Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

[4] Under a strict scrutiny review, State action infringing on First Amendment rights will be upheld only if it is narrowly tailored to meet a compelling government interest. Gard v. State Elections Bd., 156 Wis. 2d 28, 44, 456 N.W.2d 809 (1990).

4

that plaintiff is claiming a right to <u>bargain</u> as a collective bargaining unit.[5]  It then determines that no such right exists.

¶195 In rejecting Madison Teachers' purported claims, the majority stresses that "[g]eneral employees have no constitutional right to negotiate with their municipal employer."  Majority op., ¶38.  It further states that "collective bargaining . . . is not constitutionally protected." <u>Id.</u>, ¶39.  Accordingly, it determines that "the plaintiffs' associational rights are <u>in no way implicated</u> by Act 10's modifications to Wisconsin's collective bargaining framework." <u>Id.</u>, ¶41.

¶196 In one instance, the majority appears to acknowledge the plaintiff's actual claim but then distorts it.  The majority begins the sentence by correctly referencing "the 'right' the plaintiffs refer to──the right to associate with a certified representative." <u>Id.</u>, ¶37.  So far, so good.  However, it then ends the sentence with a distortion of the claim, describing the right being asserted as a right "to collectively bargain on any subject." <u>Id.</u>

¶197 The majority is well aware that the plaintiff has never asserted that it has a constitutional right to

---

[5] The majority spends an inordinate amount of ink attacking the dissent rather than attacking the actual associational issue.  Normally the role of the majority opinion is to expound on the arguments of the parties and the law, giving only brief attention to the comments of the written dissent.  It is unclear if the majority does this in an attempt to deflect attention from its failure to address the associational right to organize.  Or, if it is because the majority recognizes that the arguments of the dissent cannot go unaddressed.

collectively bargain, let alone bargain on any subject. In fact, elsewhere in its opinion, the majority acknowledges that the plaintiff is not arguing a constitutional right to bargain: "The plaintiffs have insisted at every stage of litigation in this case that they are not arguing a constitutional right exists to collectively bargain." Id., ¶39. Yet the majority persists in focusing its analysis on the right to bargain.

¶198 The plaintiff's actual argument is based on the well-established premise that there is a constitutional right to organize as a collective bargaining unit. In fact, the United States Supreme Court has declared it to be a fundamental right: "the right of employees to self-organization and to select representatives of their own choosing for collective bargaining or other mutual protection without restraint or coercion by their employer . . . is a fundamental right." NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 33 (1937) (emphasis added). Likewise, the Court has stated that the First Amendment most assuredly protects the right of workers to organize: "It cannot be seriously doubted that the First Amendment[] guarantees . . . the right [of workers] to gather together for the lawful purpose of helping and advising one another." Brotherhood of R.R. Trainmen v. Virginia, 377 U.S. 1, 5-6 (1964).

¶199 As early as 1902, the Wisconsin Supreme Court has similarly stressed the "sacredness" of the right of employees to organize. State ex rel. Zillmer v. Kreutzberg, 114 Wis. 530, 541, 90 N.W. 1098 (1902). Against this background, the

6

majority's failure to squarely address the plaintiff's argument is remarkable. In reaching its result the majority appears to ignore over a century's worth of jurisprudence and undermines a right long held sacred in our State.[6]

¶200 Madison Teachers' argument that Act 10 violates associational rights is twofold. First, it focuses on the provisions in Act 10 requiring collective bargaining units to hold annual recertification elections, eliminating fair share agreements, and prohibiting municipalities from withholding dues from employees' wages. It contends that these provisions violate its associational rights because they infringe on those rights by punishing association with a collective bargaining unit. Second, it argues that the provision in Act 10 prohibiting municipalities from bargaining over anything other than an increase in base wages up to the amount of inflation is an unconstitutional condition.

¶201 Rather than considering whether Act 10 discourages the exercise of the associational right to organize, the majority

---

[6] The majority denies stating that employees do not have a constitutional right to organize. Majority op., ¶46. However, its analysis belies this assertion. Madison Teachers argues that Act 10 unconstitutionally interferes with associational rights by burdening and penalizing general employees who elect to organize in a collective bargaining unit. Although the majority acknowledges that at least one of the provisions burdens labor organizations, id. ¶80, it determines that the challenged provisions of Act 10 do not burden associational rights "because in each instance, there is no constitutional associational right implicated." Id., ¶70. Indeed, it stresses this point, stating it "is vital and bears repeating: the plaintiffs' associational rights are in no way implicated by Act 10's modification to Wisconsin's collective bargaining framework." Id., ¶41.

7

pivots to a different issue advanced by the State and then analyzes that issue. It advances that the State is not required to subsidize speech, and ultimately concludes that the challenged provisions regarding fair share agreements, paycheck dues deductions, and annual recertification do not burden the exercise of associational rights. Majority op., ¶¶54, 59, 61.[7]

¶202 By pivoting to the issue of whether the constitution requires the State to subsidize speech, the majority avoids the actual argument advanced before this court: whether Act 10 infringes on the associational right to organize by discouraging membership in a collective bargaining unit. Given the void in the majority's analysis, I turn to address the actual issue.

¶203 The First Amendment protects not just against State prohibition of association, but also against State punishment or penalty for the exercise of associational rights. See Smith v. Arkansas State Highway Emps., Local 1315, 441 U.S. 463, 464 (1979) ("The government is prohibited from infringing upon [First Amendment] guarantees either by a general prohibition against certain forms of advocacy, or by imposing sanctions for

---

[7] The majority relies heavily on Wis. Educ. Ass'n Council v. Walker, 705 F.3d 640 (7th Cir. 2013), for its position. Majority op., ¶68. However, that case is distinguishable because it considered a different issue than is presented here. Wis. Edu. Ass'n Council examined whether Act 10 burdened the free speech rights of collective bargaining units. 705 F.3d at 645-53. The petitioners asserted that the prohibition on dues deductions constituted viewpoint discrimination because it was imposed only on those collective bargaining units that did not endorse Governor Walker in the prior election. The court did not consider whether Act 10 burdened the right of individuals to organize in a collective bargaining unit.

the expression of particular views it opposes."); <u>Baird v. State
Bar of Ariz.</u>, 401 U.S. 1, 6 (1971) ("The First Amendment's
protection of association prohibits a State from . . .
punishing [a person] solely because he is a member of a
particular political organization or because he holds certain
beliefs."). In other words, the State cannot "tak[e] steps to
prohibit or <u>discourage</u> union membership or association." <u>Smith</u>,
441 U.S. at 466 (emphasis added).

¶204 The United States Supreme Court illustrated this
principle in <u>NAACP v. Alabama ex rel. Patterson</u>, 357 U.S. 449
(1958). <u>Patterson</u> involved a State requirement that NAACP
reveal its membership list. The court determined that the State
action was "likely to affect adversely the ability of petitioner
and its members to pursue their collective effort[s] [by] . . .
induc[ing] members to withdraw from the Association and
dissuad[ing] others from joining it." <u>Id.</u> at 462-63. Thus,
because the requirement that NAACP reveal its membership list
was not supported by a compelling government interest, the court
determined that it was unconstitutional. <u>Id.</u> at 466.

¶205 Similarly, the provisions in Act 10 discourage
organizing as a collective bargaining unit by increasing its
cost. Wisconsin Stat. § 111.70(4)(d) requires collective
bargaining units to hold recertification elections annually in
which 51% of all eligible employees must vote in favor of
recertification. In addition to the costs involved in educating
employees about the election and convincing employees to vote,

collective bargaining units must pay a certification fee. Wis. Stat. § 111.70(4)(d)3.b.

¶206 Further, although collective bargaining units must provide benefits to all members, Act 10 eliminates fair share agreements requiring members to pay their proportionate share of the cost of providing those services.[8] Wis. Stat. § 111.70(1)(f), (2). Collective bargaining units' finances are also diminished by Wis. Stat. § 111.70(3g) which prohibits municipalities from withholding union dues from employees' wages.[9]

¶207 By making membership unduly expensive, these Act 10 provisions collectively infringe on the associational right to organize. There is no doubt that these provisions act to discourage membership. The majority's narrow focus on whether the State is required to facilitate free speech shifts the focus from this issue. In doing so, the majority avoids directly addressing the question of whether these provisions impermissibly punish the exercise of the right to associate.

---

[8] Although the majority questions the constitutionality of fair share agreements, majority op., ¶58, the United States Supreme Court recently affirmed that fair share agreements for "full-fledged state employees" are constitutionally permissible. Harris v. Quinn, 573 U.S. __, *29 (June 30, 2014). Harris dealt with a challenge to fair share agreements brought by personal assistants. The court determined that because personal assistants were not full-fledged public employees they could not be compelled to make fair share payments.

[9] It is notable that the majority recognizes this as a burden in its discussion of the equal protection claims. Majority op., ¶78.

¶208 The majority similarly avoids addressing Madison Teachers' second argument, that Act 10 creates unconstitutional conditions. Again, it simply reshapes the argument.

¶209 The majority reasons that because negotiating with employees is not constitutionally required, it cannot be a constitutional violation to withhold such benefits from members of collective bargaining units. Majority op., ¶37-38 (emphasis added). The focus of its analysis is deceptive as the doctrine of unconstitutional conditions does not look at whether the benefit is required. Regardless of whether the benefit is required, the doctrine focuses on whether an individual is required to give up a constitutionally protected right in order to obtain the benefit.

¶210 The doctrine of unconstitutional conditions provides that "the government may not deny a benefit to a person because he exercises a constitutional right." Koontz v. St. Johns River Water Mgmt. Dist., 133 S. Ct. 2586, 2594 (2013). This doctrine reflects the idea that "the Constitution's protection is not limited to direct interference with fundamental rights." Healy v. James, 408 U.S. 169, 183 (1972). Freedoms, such as the right to associate, "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." Bates v. City of Little Rock, 361 U.S. 516, 523 (1960).

¶211 Even though there may be no constitutional right to a benefit, the State cannot premise receipt of that benefit upon a person foregoing a constitutionally protected right. Bd. of

11

Cnty. Comm'rs v. Umbehr, 518 U.S. 668, 674 (1996). Such a condition effectively punishes the free exercise of constitutional liberties, accomplishing indirectly what the State cannot command directly. Sherbert v. Verner, 374 U.S. 398, 406 (1963).

¶212 The seminal Wisconsin case applying this doctrine is Lawson v. Housing Auth. of Milwaukee, 270 Wis. 269, 70 N.W.2d 605 (1955). In Lawson, the court held that it was impermissible for a federal statute to condition federal low-income housing on tenants not being members of "subversive organizations." Id. at 274. This was true despite the fact that there was no constitutional right to federal low-income housing.

¶213 The court explained that if the government could defend a statute "on the ground that the plaintiff is being deprived thereby only of a privilege, and not of a vested right, there is extreme danger that the liberties of any minority group in our population, large or small, might be swept away." Id. at 275. In other words, once the government has decided to grant a benefit, it cannot condition that benefit on relinquishment of a constitutionally protected right.

¶214 The majority pays lip service to this doctrine, but then fails to actually apply it. Majority op., ¶¶29, 38. Its focus on whether the benefit itself is required belies any suggestion that the majority is following the precedent on unconstitutional conditions.

¶215 Act 10 is clear: if you have exercised your associational right to organize as a collective bargaining unit

you lose your ability to negotiate over anything other than an increase in base wages up to the amount of inflation. Wis. Stat. §§ 111.70(4)(mb), 66.0506, 118.245. This is the textbook definition of an unconstitutional condition. By permitting such a statute to stand, the majority greatly dilutes the First Amendment protection on the right to freedom of association.

¶216 Because Act 10 infringes on associational rights to organize by discouraging and punishing membership in collective bargaining units, it can survive strict scrutiny only if it is narrowly tailored to meet a compelling government interest. The State has made no argument that Act 10 is narrowly tailored to meet a compelling government interest and has conceded that it cannot meet this standard. Accordingly, I conclude that the challenged provisions of Act 10 violate the constitutional right of public employees to organize in a collective bargaining unit.[10]

---

[10] Madison Teachers alleges that Act 10 also violates the equal protection clause. It points to the fact that Wis. Stat. §§ 111.70(4)(mb), 66.0506, and 118.245 prevent collective bargaining units from negotiating anything other than base wage increases up to the amount of inflation. Non-members of collective bargaining units are not subject to this restriction. Further, Wis. Stat. § 111.70(3)(g) prohibits municipalities from withholding dues for collective bargaining units. There is no similar restriction preventing municipalities from withholding dues for other types of organizations.

As discussed above, the right to organize in a collective bargaining unit is encompassed in the fundamental right to associate protected by the First Amendment. See supra, ¶¶18-19. The challenged provisions of Act 10 implicate those associational rights because they treat employees that are members of a collective bargaining unit differently than employees that are not members of collective bargaining units. As these provisions of Act 10 implicate the fundamental right to

13

## II. Home Rule

¶217 Next, Madison Teachers challenges the provision in Act 10 which prohibits the City of Milwaukee from making pension contributions on behalf of its employees, Wis. Stat. § 62.623(1).[11] It alleges that this provision violates the Home Rule Amendment.[12]

¶218 The majority responds by shifting the focus to whether Act 10 as a whole implicates a matter of statewide concern. It determines that because the purpose of Act 10 is to alleviate "fiscal strain," the challenged legislation is primarily a matter of statewide concern. Based primarily on fiscal concerns, the majority concludes that Act 10 does not violate

---

associate, strict scrutiny, rather than rational basis review, should be applied to evaluate whether Act 10 violates the equal protection clause.

[11] Wisconsin Stat. § 62.623(1) provides:

Beginning on July 1, 2011, in any employee retirement system of a 1st class city . . . employees shall pay all employee required contributions for funding benefits under the retirement system. The employer may not pay on behalf of an employee any of the employee's share of the required contributions.

[12] The Home Rule Amendment provides:

Cities and villages organized pursuant to state law may determine their local affairs and government, subject only to this constitution and to such enactments of the legislature of statewide concern as with uniformity shall affect every city or every village.

Wis. Const. art. XI, § 3, cl. 1.

the Home Rule Amendment.[13]  Id., ¶¶109, 111-15.  Over and over again the majority emphasizes that legislation implicating fiscal issues is a matter of statewide concern:

- "[S]tatewide legislation aimed at improving the fiscal health of the State budget is indisputably a general state concern."  Id., ¶115.

- "[T]he legislature's determination in 1947 that pension and retirement plans are a local concern does not mean it is an accurate portrayal of how pension and retirement plans impact the fiscal realities of Wisconsin in 2014."  Id., ¶127.

- "The legislature has broad latitude to experiment with economic problems and we do not presume to second-guess its wisdom."  Id., ¶119.

See also id., ¶¶111, 118, 120, 122.  In other words, when the State has budgetary issues local finances are matters of statewide concerns, even absent any showing of impact on the State budget.

¶219 This determination is stunning, not just because of its breadth, but also because it runs counter to the history of

---

[13] I acknowledge that the majority references other justifications for why Wis. Stat. § 62.623 affects a matter of primarily statewide concern.  However, the discussion that the majority devotes to these other justifications is minor to that compared with the repeated and much discussed primary justification, i.e., the fiscal strain makes this a matter primarily of statewide interest.

In a single paragraph the majority mentions the State's historic role in matters affecting the employer-employee relationship.  Majority op., ¶115.  In another single paragraph it touches upon the State's obligation to maintain a functioning civil service system.  Id., ¶118.  Finally, it takes two short paragraphs to mention the scope of Act 10 as justification.  Id., ¶¶121-22.

15

the Home Rule Amendment and Milwaukee's pension system, ignores our precedent, and is unsupported by fact. The majority's result substantially strips municipalities of their right to self-govern as granted by the Home Rule Amendment because much of what municipalities do involves "fiscal matters."

¶220 The Home Rule Amendment grants cities and towns the authority to determine their own local affairs, subject only to "enactments of the legislature of statewide concern as with uniformity shall affect every city or every village." Wis. Const. art. XI, § 3, cl. 1. A review of its history demonstrates that it was enacted in response to calls "to decrease the role of the state legislature in establishing municipal governments and to provide cities and villages with greater authority to determine their own affairs." Kerry A. Burchill, Madison's Minimum-Wage Ordinance, Section 104.001, and the Future of Home Rule in Wisconsin, 2007 Wis. L. Rev. 151, 161-62; Robert W. Hansen, Municipal Home Rule in Wisconsin, 21 Marq. L. Rev. 74, 76 (1937).[14]

---

[14] Prior to its enactment, the Home Rule Amendment was touted by multiple newspapers which emphasized the necessity of local control of local affairs. One journal explained: "the legislature of Wisconsin is gradually but surely taking away the rights of municipalities to govern themselves. The matter has reached the point today where democracy is in danger of being replaced by imperialism." Gas Tax Wanted Home Rule Too, Stevens Point Daily Journal, June 14, 1924, at 6.

¶221 Under the Home Rule framework, the funding of a city's pension plan has historically been viewed as primarily local in nature. The legislature recognized this when it authorized Milwaukee to establish its own Milwaukee Employee Retirement System (MERS). § 31(1), ch. 41, Laws of 1947. It expressly declared Milwaukee's pension system to be "a local affair" that should not be construed as a matter of statewide concern:

> For purpose of giving to cities of the first class the largest measure of self-government with respect to pension annuity and retirement systems compatible with the constitution and general law, it is hereby declared to be the legislative policy that all future amendments and alterations to this act are matters of local affair and government shall not be construed as an enactment of state-wide concern.

§ 31(1), ch. 441, Laws of 1947.

---

Similar sentiments were expressed in other newspapers. See, e.g., Joseph P. Harris, Questions and Answers, Madison Capital Times, Jan. 19, 1924, Saturday Afternoon Ed., at 9 ("Home rule secures to cities and villages a larger share in the control over matters of purely local concern. It frees the city or village from a considerable amount of state interference and regulation."); Home Rule, Wisconsin Rapids Daily Tribune, Oct. 29, 1924, at 4 ("The meaning of the amendment is briefly stated by the legislative committee of the Milwaukee common council, which is working for its adoption, as follows: The home rule amendment if passed will give villages and cities in Wisconsin broader self-governing powers and leave local affairs to the local governing bodies, without first seeking the authority from the legislature.").

Public statements intended to persuade voters during the ratification process inform the interpretation of a constitutional amendment. Appling v. Walker, 2014 WI 96, ¶¶28-37, ___ Wis. 2d ___, ___ N.W.2d ___; see also Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, ¶19, 295 Wis. 2d 1, 719 N.W.2d 408.

¶222 The majority's determination that the funding of Milwaukee's pension system is primarily a matter of statewide concern also ignores precedent. In State ex rel. Brelsford v. Ret. Bd. of the Policemen's Annuity & Benefit Fund, 41 Wis. 2d 77, 163 N.W.2d 153 (1968), a constitutional challenge was brought against a Milwaukee charter amendment that permitted retired police officers to receive pensions while working as school teachers. The court determined that pension funds for Milwaukee police officers "seem[] overwhelmingly to be a matter of predominate local concern." Id. at 87.

¶223 The court explained that "the state would have little interest in whether a retired policeman taught school in Milwaukee or in some other municipality. This is a matter of unique interest to Milwaukee." Id. Similarly, the court has described "the control of the locality over payments from the local purse" as one of a municipality's "most important" functions. Van Gilder v. City of Madison, 222 Wis. 58, 81-82, 267 N.W. 25 (1936).[15]

¶224 As discussed in State ex rel Ekern v. City of Milwaukee, 190 Wis. 633, 641, 209 N.W. 860 (1926), a "local affair" is one "which much more intimately and directly concerns

---

[15] Van Gilder created an exception to this general rule for the salaries of police officers, noting that "the preservation of order, the enforcement of law, the protection of life and property, and the suppression of crime are matters of state-wide concern." Van Gilder v. City of Madison, 222 Wis. 58, 76, 267 N.W. 25 (1936). As discussed above, this exception did not extend to police pension funds. State ex rel. Brelsford v. Ret. Bd. of the Policemen's Annuity & Benefit Fund, 41 Wis. 2d 77, 87, 163 N.W.2d 153 (1968).

18

the inhabitants of that community than the casual visitor or the other parts of the state." The funding of Milwaukee's pension fund for its city employees fits within this description. The fund is "entirely self-reliant in both its management and funding." Majority op., ¶114. Accordingly, its funding has no demonstrable impact on other parts of the State.

¶225 Our jurisprudence is consistent with that of other states that have determined that compensating city employees is primarily a matter of local concern. See, e.g., Bruckshaw v. Paolino, 557 A.2d 1221, 1224 (R.I. 1989) ("the regulation of city employee pensions is of local concern"); N. Ohio Patrolmen's Benevolent Ass'n v. Parma, 402 N.E.2d 519, 525 (Ohio 1980) ("the ability to determine the salaries paid to city employees is a fundamental power of local self-government."); City of Colorado Springs v. State, 626 P.2d 1122, 1127 (Colo. 1980) ("Although the establishment of firemen's pension plans is of statewide concern, the extent to which a home rule city must provide financial support for such a plan is a question intimately involving city budgeting and the assessment and collection of taxes for municipal purposes. These are local and municipal matters."); Sonoma Cnty. Org. of Public Emps. v. Cnty. of Sonoma, 591 P.2d 1, 13 (Cal. 1979) ("the wages paid to employees of charter cities as well as charter counties is a matter of local rather than statewide concern."); Crawford v. City of Chicago, 710 N.E.2d 91, 98 (Ill. App. Ct. 1999) ("The power to extend to its employees both compensation and benefits

19

is ineluctably essential to the operation of local governmental units such as the City in the present case.").[16]

¶226 Further undermining its analysis, the majority relies on the broad purpose behind Act 10, rather than the purpose behind the specific statute at issue, Wis. Stat. § 62.623(1). It does so absent any facts in the record showing that Wis. Stat. § 62.623(1) does anything to achieve Act 10's purpose or is in any way related to the State budget. Majority op., ¶¶118-23.

¶227 The State presented no credible evidence showing that Milwaukee pension expenditures have any impact on the State budget. Although the State pointed to its "shared revenue" program, the amounts provided by the State to a municipality under that program are not based on the municipality's budget or expenditures. See Wis. Stat. §§ 79.02, 79.035.

¶228 The shared revenue program does not show a relationship between city contributions to city employee pension plans and the State budget. Indeed, even the majority recognizes that the administration of a city's retirement system is "entirely self-reliant in both its management and funding." Majority op., ¶114. There are no facts in the record to determine that Milwaukee's funding of employee pensions has any

---

[16] See also Rebecca Hanner White, Robert E. Kaplan, & Michael W. Hawkins, Ohio's Public Employee Bargaining Law: Can it Withstand Constitutional Challenge?, 53 U. Cin. L. Rev. 1, 31 (1984) ("The establishment of wages, hours, and other terms and conditions of employment and decisions pertaining to hiring, promotion, retention, discipline and dismissal of employees are fundamental aspects of local government.").

20

effect on statewide financial concerns. Accordingly, the majority's determination that Wis. Stat. § 62.623 concerns primarily a statewide matter is unsupported.

¶229 Having determined that Wis. Stat. § 62.623 is primarily a statewide matter, the majority declines to analyze what it describes as the second step of a Home Rule challenge: uniformity. Id., ¶94. After devoting several paragraphs to expound on uniformity, id., ¶¶91-95, 98-99, 102-09, the majority makes no attempt to apply its uniformity analysis to the facts of this case. Without any discussion or explanation the analysis simply ends. This presents a significant void in the majority's analysis.

¶230 The issues of when and whether a statute applying to a specific set or class of cities is uniform requires a nuanced analysis. State ex rel. Michalek v. LeGrand, 77 Wis. 2d 520, 530 n.16, 253 N.W.2d 505 (1977). The concern of targeting individual cities is echoed throughout case law as the court has grappled with the problem of uniformity in the home rule context. See, e.g., id.; State ex rel. Sleeman v. Baxter, 195 Wis. 437, 448, 219 N.W. 858 (1928); Ekern, 190 Wis. at 642. The majority opinion cannot simply wave away these concerns by abruptly ending its analysis. The hole left in the majority's application on this issue further renders its conclusion infirm.

¶231 By determining that Wis. Stat. § 62.623(1) primarily concerns a statewide matter because it deals with finances, the majority ignores the history of the Home Rule and the Milwaukee pension system, as well as relevant case law, and has greatly

21

narrowed the scope of the Home Rule Amendment. Further, its focus on the purpose behind a broad act, absent any evidence that the specific legislation is actually aimed at affecting that purpose, gives the legislature more leeway to legislate on local issues than was intended by the Home Rule Amendment.

¶232 Under the majority's holding it is hard to imagine what is left for municipalities to govern autonomously. Accordingly, for the reasons discussed above, I conclude that the majority has not saved Wis. Stat. § 62.623(1) from its constitutional challenge.

### III. Contract Clause

¶233 Madison Teachers also asserts that the provision in Act 10 prohibiting Milwaukee from making pension contributions on behalf of its employees violates the Contract Clause of the Wisconsin Constitution.[17] It argues that the Milwaukee Charter Ordinance constitutes a contract guaranteeing its right to benefits. Because Act 10 prohibits the benefit of employer funded pension contributions, it contends that Act 10 interferes with its contract rights.

¶234 By twisting the definition of the word "benefit," the majority determines that employer pension contributions are not really benefits at all. As a consequence it is able to exclude the employer contributions, determining that they are not part

---

[17] The Contract Clause provides: "[n]o bill of attainder, ex post facto law, nor any law impairing the obligation of contracts, shall ever be passed." Wis. Const. art. I, § 12.

22

of the benefit contract as provided in the Milwaukee Charter Ordinance. Accordingly, it concludes that the provision in Act 10 prohibiting Milwaukee from making pension contributions does not violate the Contract Clause.

¶235 This analysis is problematic in two respects: (1) it overlooks the language of the Milwaukee Ordinance and (2) it is contrary to the ordinary meaning of the term "benefit." By overlooking language in the ordinance and by demonstrating its willingness to creatively interpret contract terms to avoid finding a violation of the Contract Clause, the majority undermines the right to contract.

¶236 Under the Contract Clause, "[n]o . . . law impairing the obligation of contracts, shall ever be passed." Wis. Const. art. I, § 12. Although the Milwaukee Charter Ordinance provided that the city will make pension contributions to MERS on behalf of its employees, the legislature included in Act 10 provisions prohibiting Milwaukee from making those contributions. Wis. Stat. § 62.623. Madison Teachers asserts this statute violates the Contract Clause.

¶237 Milwaukee's Charter Ordinance provides that Milwaukee will fund member pension contributions to MERS on behalf of its employees. Specifically, it states that "the city shall contribute on behalf of general city employees 5.5% of such member's earnable compensation." Mil. Ch. Ord. § 36-08-7-a-1.

¶238 Next, the ordinance states that employees shall have a benefit contract as provided by the ordinance that shall not be impaired by future legislation:

23

> Every such member . . . shall thereby have a benefit contract in . . . all . . . benefits in the amounts and upon the terms and conditions and in all other respects as provided under this [ordinance] . . . and each member and beneficiary having such a benefit contract shall have a vested right to such . . . benefits and they shall not be diminished or impaired by subsequent legislation or by any other means without his consent.

Mil. Ch. Ord. § 36-13-2-a.

¶239 Then, the ordinance states that employees have a vested contract right to their benefits:

> Every member, retired member, survivor and beneficiary who participates in the combined fund shall have a vested and contractual right to the benefits in the amount and on the terms and conditions as provided in the law on the date the combined fund is created.

Mil. Ch. Ord. § 36-13-2-g.

¶240 The majority acknowledges that those provisions create a contract right to pensions, but determines that they do not create a contract right to pension contributions. Majority op., ¶¶144-45, 156-57. It notes that "[f]or a legislative enactment to be considered a contract, 'the language and circumstances [must] evince a legislative intent to create private rights of a contractual nature enforceable against the State.'" Id., ¶142 (quoting Wisconsin Prof'l Police Ass'n, Inc. v. Lightbourn, 2001 WI 59, ¶145 n.188, 243 Wis. 2d 512). Reasoning that there is no indication that the city council intended to classify pension contributions as benefits, the majority determines that there is no contractual obligation for Milwaukee to make those payments. Id., ¶¶150, 153, 158.

¶241 The majority supports its strained interpretation of the term "benefit" with a cursory reading of Milwaukee's Charter

24

Ordinance. It suggests that the term "benefits" as used in the ordinance, cannot mean pension contributions because Milwaukee's obligation to pay employee contributions "is conspicuously absent from [the section of the Milwaukee Charter Ordinance titled "Benefits," Mil. Ch. Ord. § 36-05]." Id., ¶152.

¶242 In reaching its result, the majority overlooks the very first section in the benefits chapter of the Milwaukee Charter Ordinance. Milwaukee Charter Ordinance § 36-05-1-d specifically incorporates Mil. Ch. Ord. § 36-08-7, which requires the city to fund the 5.5% member contributions of its employees. It states:

> The member shall be guaranteed that if the total benefit in the form of a monthly retirement allowance . . . does not equal the amount of the member's contributions as provided for in s. 36-08-7 [requiring the city to fund those 5.5% member contributions], . . . then the balance of the member's contributions with interest shall be payable in lump sum amount to a designated beneficiary or to an estate entitled thereto.

Mil. Ch. Ord. § 36-05-1-d (emphasis added).[18]

---

[18] The majority appears to either dismiss or overlook additional sections of the Ordinance: "Separation Benefits," Mil. Ch. Ord. § 36-05-6-6, and "Ordinary Death Benefit," Mil. Ch. Ord. § 36-05-6-10. Both likewise reference Milwaukee's contributions to the pension funds. Both reference "accumulated contributions," which is a defined term that incorporates the 5.5% city funded member contributions as set forth in Mil. Ch. Ord. § 36-08-7.

25

¶243 Indeed, the majority's assertion that pension contributions are not benefits is contrary to the common use of the term "benefits." See, e.g., State ex rel. City of Manitowoc v. Police Pension Bd., 56 Wis. 2d 602, 612A, 203 N.W.2d 74 (1973) ("[I]n view of modern day employment inducements, fringe benefits such as insurance premiums, pension fund contributions and perhaps others are to be included in the formula for calculating pension benefits for police and firemen."); Titan Tire Corp. of Freeport, Inc. v. United Steel, Paper, & Forestry, Rubber, Mfg., 734 F.3d 708, 731 (7th Cir. 2013) ("They were also receiving an array of fringe benefits, including health care and pension contributions."); City of Ft. Wayne v. Ramsey,

---

The Separation Benefits provision states: "Should a member cease to be an employee . . . he or she shall be paid his or her accumulated contributions as they were at date of separation from service." Mil. Ch. Ord. § 36-05-6-6 (emphasis added). Similarly, the Ordinary Death Benefit provision states: "Upon receipt of proper proofs of death . . . his or her accumulated contributions shall be paid to such person, or such trustee, if any, as he or she has nominated." Mil. Ch. Ord. § 36-05-06-10 (emphasis added).

"Accumulated contributions" is a defined term in the ordinance, referring to "the sum of the contributions in the member's account, as provided for in s. 36-08-7-i." Mil. Ch. Ord. § 36-02-1. Section 36-08-7-i of Milwaukee's Charter Ordinance states in relevant part that "[t]he member's account shall consist of those member contributions deposited in accordance with pars. . . b." Again, paragraph b requires Milwaukee to make contributions on behalf of its employees into their pension account. Mil. Ch. Ord. § 36-08-7-b. Thus, the majority's reliance on the absence of employer contributions from the benefits chapter of the Milwaukee Charter Ordinance appears misplaced.

26

578 N.E.2d 725, 728 (Ind. Ct. App. 1991) ("employer-paid pension contributions are in the nature of a fringe benefit").

¶244 Not only is the majority's assertion contrary to the common use of the term, it is contrary to the majority's common experience. Every year the State of Wisconsin sends to its employees a "Statement of Annual Benefits."[19] The benefit of employer pension contributions is among the several benefits listed. For executive branch employees, pension contributions = benefits. For legislative branch employees, pension contributions = benefits. As the majority well knows, for judicial branch employees, pension contributions = benefits. Every State of Wisconsin paycheck stub lists an employer paid pension contribution as a benefit.

¶245 Nevertheless, the majority persists in twisting the definition of benefit allowing it to creatively interpret a contract in a manner permitting the State to disregard it. The majority rests its conclusion that there is no violation of the Contract Clause on the analytically unsupportable premise that for Milwaukee, an employer pension contribution is not a benefit.

¶246 The majority's strained reading of the term "benefit," excluding employer pension contributions from its definition, is contrary to the use of the term "benefit" in the Milwaukee Charter Ordinance and the common use of the term. Accordingly, its analysis of whether the prohibition on employer

_____

[19] Dep't of Employee Trust Funds, WI Retirement System, Form No. ET-7365.

contributions in Wis. Stat. § 62.623 violates the Contract Clause does not withstand scrutiny. Allowing Wis. Stat. § 62.623 to stand undermines the protections of the Contract Clause.

IV.

¶247 In sum, the majority's failure to address the actual issues presented in this case allows it to reach results that countenance the needless diminution of multiple constitutional rights. The right to freedom of association is diluted as the majority has opened the door for the State to withhold benefits and punish individuals based on their membership in disfavored groups. Municipalities' right to self-govern as granted by the Home Rule Amendment now rings hollow as the majority determines that when the State has budgetary concerns, anything dealing with local finances is a statewide matter. And the right to contract is undermined as the majority demonstrates its willingness to creatively interpret a contract in a manner permitting the State to disregard it.

¶248 For the reasons set forth above, I determine that Act 10 unconstitutionally infringes on protected rights. Accordingly, I respectfully dissent.

¶249 I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this dissent.

28